# VILLAGE OF MINNEOTA v. FAIRBANKS, MORSE & COMPANY.[1]

March 19, 1948.

No. 34,569.

[1]Reported in 31 N. W. (2d) 920.

2

*E. V. Molle* and *Eldon J. Spencer,* for appellant.

*Briggs, Gilbert, Morton, Kyle & Macartney* and *Poppenhusen, Johnston, Thompson & Raymond,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order denying plaintiff's motion for amended findings or for a new trial.

On August 16, 1940, plaintiff, a municipal corporation, by its village council, entered into an agreement in writing with defendant, whereby the latter agreed to construct for the former an electric power plant and distribution system according to plans and specifications on file with the village clerk. Prior to the date of this agreement, the voters of the village had voted in favor of the plant, and the council had purchased a site for a powerhouse and engaged consulting engineers to prepare plans and specifications. Upon approval by the council of the plans and specifications for the plant and after submission of bids, defendant was awarded the contract. About six days after the execution of the contract, defendant filed its bond with the village clerk conditioned for the faithful performance of its part of the contract. The specifications provided that work under the contract should commence within ten days after filing the bond and should be completed within 180 days thereafter. Section 18 provides in part as follows:

"Should the contractor be delayed in the prosecution or completion of the work by the act, neglect or default of the owner, or of any one employed by the owner, or by fire, or by general strikes, or for any other reason deemed sufficient by the Engineers, then the

time fixed herein for the completion of the work shall be extended for a period equivalent to the time lost by reason of any of the aforesaid causes. Such extensions of time shall be determined and fixed by the Engineer, but no such extension shall be made unless a demand is presented in writing to the Engineers within forty-eight hours of the occurrence of such delay."

No application for an extension was made by either party. Plaintiff claims that this section is specific evidence that the parties contemplated delays beyond their control.

Prior to the execution of the written agreement of August 16, 1940, an action had been commenced against plaintiff by the Union Public Service Company, the public utility then serving the village, to obtain a declaratory judgment that it had a franchise with the village until September 1944. As a result of the commencement of that suit and before bids were received, the specifications were amended by inserting the following:

"ADDENDUM No. 2.

"The Union Public Service Company, the Public Utility now serving the Village and its inhabitants, having instituted a lawsuit against the Village, claiming that it has a franchise for a period of five years from September, 1939, to furnish electricity to the Village and its inhabitants, the contractor will not be required to commence construction of the plant under these specifications until the said litigation has been finally determined in favor of the Village. If not so determined, the contract shall be null and void."

Work has never been commenced under the contract of August 16, 1940. The Union Public Service Company franchise suit was decided by this court in favor of the village on February 20, 1942. Union Public Service Co. v. Village of Minneota, 212 Minn. 92, 2 N. W. (2d) 555. On March 19, 1942, judgment was entered in the district court determining that the Union Public Service Company had no franchise rights in the village of Minneota. In the meantime, on December 8, 1941, while the franchise case was pending in this court, the United States became engaged in war. On March 18, 1942, after

the determination of the franchise suit, plaintiff applied to the War Production Board at Washington for a preference rating certificate so as to permit defendant to construct the plant provided for in the contract. This application was denied on March 25, 1942, the following reason being assigned:

"Because of the acute shortage of critical materials needed for direct war use, it is suggested that you continue to operate with your present facilities."

No further application was ever made by plaintiff for a preference rating certificate.

The trial court found that under the federal laws and regulations applicable in February and March 1942 and thereafter defendant could not lawfully perform the contract until such time as plaintiff could obtain a preference rating from the War Production Board. It further found that at all times from January 1942 until October 1945 regulations and orders of the War Production Board were in effect which prohibited performance of the contract without authorization from the board; that such authorization could not be obtained; and that it was impossible to commence construction of the plant during that period.

It is undisputed that wartime restrictions prevented performance of the contract before October 1945, at which time construction costs had increased considerably. Plaintiff contends, however, that it was the duty of defendant to perform after elimination of governmental priority restrictions and that defendant continued to represent to plaintiff until about December 1945 that it was anxious to perform the contract. Plaintiff also claims that it has incurred the costs of procuring a site in connection with the contract, amounting to $1,000, engineer's fees in the sum of $2,231.57, $500 for preliminary survey, and costs of litigation approximating $1,000. It contends that these disbursements were all made in furtherance of the contract and for the most part will be a total loss if the contract is not completed. Defendant argues that these expenses were necessarily incurred long before the contract was made between the parties,

since a site, plans and specifications, and an election were preliminary essentials of the project.

Plaintiff brought this action for a declaratory judgment that the contract is in full force and effect; that said contract by its terms was not discharged by reason of the intervention of wartime restrictions, but that only the time of performance was extended until the removal of such restrictions; and that defendant is under an obligation to perform its part of the contract and to complete the power plant and distribution system. Defendant calls attention to the court's findings as to the regulations of the War Production Board which prohibited performance of the contract without authorization from the board, which authorization could not be obtained, and that as a result it was impossible for defendant to commence construction of the plant between January 1942 and October 1945, while the governmental restrictions were in force. Defendant contends that under the terms of addendum No. 2, if the Union Public Service Company franchise should be determined by the court to be in effect until September 1944 the contract between plaintiff and defendant was to be void, and that if the Union company failed in its claim of a franchise the contract was to be in effect. Defendant claims that by this provision plaintiff clearly indicated that unless the municipal plant was in operation prior to September 1944 it would not proceed with the project. The trial court found:

"By the terms of the contract of August 16, 1940, plaintiff and defendant intended and provided that if construction work on the municipal light and power plant could not be begun before September, 1944, the contract would then terminate, and both parties would be released and discharged from liability thereunder."

The principal question for consideration here is whether it was the intention of the parties, by the insertion of addendum No. 2, to terminate the contract and release each other if construction work on the plant could not be started before September 1944.

In its brief, plaintiff claims that the only issue made by the pleadings and evidence in this case is whether the contract was dis-

charged because of impossibility of performance arising from war causes. It considered such issue under the following statements:

(1) By inserting addendum No. 2 in the contract the parties did not intend absolutely to limit the time of performance. The lower court held that inability of the contractor to perform its part of the contract prior to September 1944 discharged the contract.

(2) The contract was not discharged because of wartime conditions delaying performance under the theory of frustration of contracts.

(a) The contract sufficiently provides for extensions where performance is delayed by any valid cause, including war, and the intervention of war operated to render the contract dormant but not to discharge it.

(b) The parties by their acts and conduct after war restrictions went into effect mutually extended performance until war restrictions should be removed.

(c) The parties provided in the contract that it should not be discharged except by complete performance by both parties; and they made no provision in the contract for its termination in the event of war, although war was probable and reasonably foreseeable when the contract was executed.

It appears from the evidence that when the War Production Board denied the necessary priorities in March 1942, G. M. Orr, plaintiff's engineer, was engaged in war work. Under the conditions then prevailing, apparently both parties recognized the necessity for delay in performance and decided to let the contract lie dormant pending a change in conditions. Discussions with reference to the contract continued between representatives of the parties from time to time until as late as November 1945, when, according to the testimony of Einar O. Hallgrimson, village mayor, he had a talk with A. C. Thompson, district manager for defendant, who told him that he was just as anxious to build the plant as the people of Minneota were to have it built. Victor Etem, field engineer for defendant, testified that even after the application for priorities was denied to the village in March 1942 he continued to visit Minneota to main-

tain good will and his acquaintances during the entire period of the war, except for an interval when he was off the territory at the factory in Beloit. On these visits, he called on the village officials informally, and he claimed that in their conversations there was some speculation about extending the contract, how it might be amended or extended, and "we were hopeful that there might be a mutually advantageous arrangement whereby we could prosecute the contract." When asked on cross-examination whether he or Mr. Thompson figured on completing the contract up to the time they got a stop order from the Chicago office, he replied, "Not with any certainty. We were hopeful." G. M. Orr, plaintiff's engineer, testified that he returned to civilian practice on December 15, 1943, and that he called Mr. Thompson late in 1944 to see what could be done to get the work started at Minneota and was informed that it would have to wait until the end of the war. He conferred with Thompson after the war was over and was told that the attorneys were working on the contract "trying to iron something out." Mr. Thompson testified that, while the contracts were drawn in his office, they were submitted to the head office in Chicago for approval. He said that his office coöperated with the village in the preparation of an application to the War Production Board for priorities in March 1942, and that they were then prepared and willing to go on with the construction of the plant if priorities were granted. He admitted conversations with Mr. Hallgrimson, the mayor, to the effect that, "with qualifications," he was as anxious to complete the plant as the village was to have it completed, but he could not say whether it was in November 1945 when he had talked to the mayor. He also admitted that until December 1945 or January 1946, when his company informed the village that they would not perform the work, they had hoped to be able to do so. Plaintiff claims that this evidence demonstrates that the parties themselves mutually agreed to extend the time of performance until the removal of wartime restrictions and that thereby they adopted a practical construction of the contract which is inconsistent with the findings of the trial court.

Defendant argues that when addendum No. 2 was adopted it was a matter of common knowledge that it might take from one to two years for the Union Public Service Company suit to be determined, and that at that time neither of the parties contemplated a war. Plaintiff disagrees with this statement and claims that there were many signs of an approaching conflict. According to defendant's claim, neither of the parties intended or contemplated that there might be a delay in performance until 1945 or 1946. In other words, defendant takes the position that under the terms of addendum No. 2 it was the intention of plaintiff that unless the plant was in operation by September 1944 the contract should be null and void. The trial court's memorandum on this point is interesting, and we quote it herewith:

"The court is unable to escape the conclusion that by Addendum No. 2 the parties indicated that a delay as long as September, 1944, should automatically terminate the contract. The fact that it specified the possible cause of the delay was the claim of the Union Public Service Company does not alter the expressed intent. The court cannot keep a bargain alive in the face of a delay which extends to and beyond the time which the parties expressly stated should nullify it.

"If Addendum No. 2 were to be paraphrased into colloquial language, it would read: 'This lawsuit started by the Union Public Service Company cannot last very long. If we win it, you can start constructing immediately after the litigation ends. If we lose, then we are stuck until September, 1944. That is too long for either of us to get tied up. In case, we have to wait that long before you can begin construction of the plant, the deal is off.'

"Addendum No. 2 was drawn especially to provide for the effects of one cause of delay. It embodied the ideas of the parties as to what they considered an unreasonable delay for the commencement of the construction of the plant from the one possible cause of delay. It declared that if there was to be a delay until September, 1944, this was so unreasonable a delay as to end the contract."

While we agree with the trial court that addendum No. 2 indicated that a delay in the commencement of construction until Sep-

tember 1944 would automatically terminate the contract, it appears to us that what was then being considered was the outcome of the franchise litigation. We cannot say that the addendum necessarily set a time limit for the termination of the contract in the event of any delay, although it does appear to have "embodied the ideas of the parties as to what they considered an unreasonable delay for the commencement of the construction of the plant from the one possible cause of delay," as expressed in the court's memorandum. Combined with this, however, we have an additional situation where it appears that because of governmental restrictions and priority regulations it would have been legally impossible for defendant to commence construction, even after the determination of the franchise suit in February 1942, until at least October 1945.

In Mascall v. Reitmeier, 145 Minn. 214, 218, 176 N. W. 486, 487, this court said:

"Strictly speaking, no contract is discharged by reason of impossibility of performance, though the law frequently reads into it an implied condition to excuse the contractor from his obligation under the particular circumstances which make performance impossible. Board of Education v. Townsend, 63 Oh. St. 514, 59 N. E. 223, 52 L. R. A. 868; Woodward, Quasi Contr. § 109."

Plaintiff contends that when defendant entered into the written contract of August 16, 1940, there were and had been prior thereto many existing signs that the United States would ultimately become involved in war. It calls attention to the fact that the President had declared a national emergency in September 1939 and that congress was debating the conscription issue. It refers to congressional consideration of the selective training and service act passed in September 1940 and similar legislation, as well as the war and defense contracts act, authorizing a system of priorities and allocations of essential materials, enacted June 28, 1940. While it is true that there were signs of preparation on the part of our government in August 1940, we cannot say that defendant should have anticipated at that time that this country would enter the war, as we are still too familiar with the surprise occasioned by the

attack on Pearl Harbor about 16 months afterward. Neither can we say that defendant should have anticipated in August 1940 the nature of the governmental priority requirements or restrictions which might be in force whenever the franchise litigation was determined. Defendant's district manager testified that they were prepared and willing to go on with the construction of the plant at the time application was made for priorities in March 1942 if priorities were granted. However, the War Production Board denied the request, so it became legally impossible at that time for defendant to commence the construction work. This prohibition continued so far as defendant was concerned until October 1945, when priority restrictions were lifted. If plaintiff considered that a delay in the commencement of the construction of the plant until September 1944 would be sufficient to nullify the contract in the event that the court found that the franchise was in effect until that time, it does not appear unreasonable to say that a delay in the commencement of the construction work until October 1945, over which defendant had no control, should also nullify the contract because of the temporary impossibility of performance.

Although the trial court did not decide this case on the ground of temporary impossibility of performance, we believe that under the facts and circumstances in the case before us this ground is available as a defense in support of the trial court's decision. The doctrine of the law of contracts which supports this position is commonly referred to as "impossibility." We quote herewith a concise statement of the doctrine from Restatement, Contracts, § 458, as follows:

"A contractual duty or a duty to make compensation is discharged, in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty, where performance is subsequently prevented or prohibited

"(a) by the Constitution or a statute of the United States or of any one of the United States whose law determines the validity and effect of the contract, or by a municipal regulation enacted with constitutional or statutory authority of such a State, or

· "(b) by a judicial, executive or administrative order made with due authority by a judge or other officer of the United States, or of any one of the United States."

*Id.* § 462, provides:

"Temporary impossibility of such character that if permanent it would discharge a promisor's entire contractual duty, has that operation if rendering performance after the impossibility ceases would impose a burden on the promisor substantially greater than would have been imposed upon him had there been no impossibility; but otherwise such temporary impossibility suspends the duty of the promisor to render the performance promised only while the impossibility exists."

2 Dunnell, Dig. § 1789, provides:

"If a party contracts absolutely to do a thing which is not impossible or unlawful, he is bound to do it, unless prevented by an act of God, the law, or the other party to the contract. There is a tendency to break away from this harsh rule of the common law in cases where the conditions have so materially changed, in an unforeseeable way, between the time of contracting and the time of performance, that justice requires that performance should be excused. * * * While impossibility of performance of a contract is not generally a defence where the impossibility arises after the contract is made, an exception is made as to acts of government. No person is presumed to covenant against the act of sovereignty."

In Summers v. Midland Co. 167 Minn. 453, 209 N. W. 323, 46 A. L. R. 816, plaintiff attempted to rescind a contract for the sale of land and recover the amount paid. The contract for deed was in the ordinary form, with installment payments required. After the execution of the contract, the city of Duluth condemned the property for a restricted residential district. Plaintiff purchased the lot involved for the purpose of erecting and operating a filling station thereon. This was prevented by the restriction. He then tendered full payment and demanded a deed conveying good title free from all encumbrances except those expressly excepted in the

contract. Defendant could not do this because of the restriction imposed upon the premises by the city of Duluth after condemnation proceedings. Treating such failure as a refusal, plaintiff attempted to rescind the contract and sued to recover the amount paid. The court in that case quoted the general rule that impossibility of performance of a contract is not a defense where the impossibility arises after the contract is made. Defendant contended that there is an exception to the general rule, in that no person is presumed to covenant against the acts of sovereignty. While the Summers case involved a matter entirely different from the instant case, the court said (167 Minn. 456, 209 N. W. 324) that "No person is presumed to covenant against the acts of sovereignty," and held that an easement which restricted the use of property acquired by condemnation subsequent to the execution of the contract for deed did not permit the purchaser to rescind and recover what he had paid under the contract on the ground of a breach of the covenant as to encumbrances.

In 6 Williston, Contracts (Rev. ed.) § 1931, in discussing the defense of "impossibility," it is stated:

"As pointed out in the Restatement of Contracts, the essence of the modern defense of impossibility is that the promised performance was at the making of the contract, or thereafter became, impracticable owing to some extreme or unreasonable difficulty, expense, injury, or loss involved, rather than that it is scientifically or actually impossible. While the mere fact that performance of a promise is made more difficult and expensive than the parties anticipated when the contract was made will not ordinarily excuse the promisor as is shown by cases too numerous for citation, nevertheless there are other decisions allowing an excuse where very greatly increased difficulty had been caused by facts not only unanticipated but inconsistent with the facts that the parties obviously assumed to exist or to be likely to continue. The true distinction is not between difficulty and impossibility. A man may contract to do what is impossible, as well as what is difficult, and be liable for failure to perform. *The important question is whether an unanticipated cir-*

*cumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract. If so, the risk should not fairly be thrown upon the promisor."* (Italics supplied.)

Here, we have a situation where temporary impossibility of performance because of governmental restrictions, if permanent, would have discharged the duty of defendant to perform. It is conceded that an excusable temporary impossibility of performance on the part of defendant existed until at least October 1945 because of governmental priority regulations. It further appears that after the cessation of this excusable temporary impossibility in October 1945 defendant would have been compelled to render performance substantially different from what it contracted for in August 1940, because of changing costs. Inasmuch as the addendum indicates that a delay in the commencement of construction until five years after September 1939, in the event of an adverse decision in the franchise case, would nullifiy the contract, we believe that under the facts and circumstances of this case, taking all those matters into consideration, it is only fair to say that an excusable delay which made it impossible for defendant to commence construction until October 1945, more than five years after the contract was signed, should also excuse defendant from performance, especially in view of the unprecedented and therefore unforeseeable conditions and circumstances which developed not only in the United States, but throughout the world during that time. In arriving at this conclusion, we are not attempting to change the well-established rules which provide that inconvenience or increased costs of compliance ordinarily will not excuse a defendant from performance. This case, however, presents a unique situation, in that defendant was first deterred by plaintiff from commencing the work until the termination of the franchise litigation in February 1942, and then legally prevented from doing the work until at least October 1945 because of governmental restrictions. During the period from August 16, 1940, to October 1945, perhaps more unprecedented conditions arose and changes occurred throughout the world than during any similar

period in history, and it would be unfair to say that defendant or anyone else should have foreseen or anticipated them as early as August 16, 1940, the date the contract was made. It cannot be said that World War I offered any precedent upon which defendant could rely, because of the fact that no such rigid priority regulations were in force at that time. We therefore hold that under the facts and circumstances of this case, and especially in light of the language used in addendum No. 2, the decision of the trial court should be affirmed.

"Our rule is that the trial court's findings are not to be set aside unless clearly or manifestly against the weight of the evidence or without any reasonable support in the evidence. The rule applies although the construction of written or documentary evidence is involved, and even if this court might be inclined to draw different inferences." Sommers v. City of St. Paul, 183 Minn. 545, 551, 237 N. W. 427, 430.

Affirmed.

