MONITE WATERPROOF GLUE COMPANY v. SAWYER-CLEATOR LUMBER COMPANY.[1]

April 27, 1951.

No. 35,162.

[1]Reported in 48 N. W. (2d) 333.

. *Daniel F. Foley,* for appellant.

*Benedict Deinard* and *Leonard, Street & Deinard,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Action for damages for breach of an oral contract covering the sale by defendant to plaintiff of 4,800 feet of No. 1 common 1½-inch oak flooring. The trial court ordered judgment for plaintiff in the sum of $1,008, plus costs. This is an appeal from an order denying defendant's motion for amended findings or a new trial.

The contract was entered into November 21, 1941. The lumber covered thereby was paid for by plaintiff on January 10, 1942. It was to be retained by defendant and delivered to plaintiff upon demand therefor. In April 1942, before delivery was demanded, executive orders promulgated under the war powers of the President of the United States made it illegal for defendant to perform the contract during the emergency created by World War II. This period of illegality terminated by further orders early in 1947.

During the interval, plaintiff made frequent requests of defendant for delivery. Each time it was advised by defendant that delivery would have to be deferred until lumber of the type purchased was again available on the market. At no time did defendant state that

the executive orders described prevented such delivery or had terminated the contract.

On October 18, 1946, defendant, in response to plaintiff's written request for delivery, wrote plaintiff as follows:

"* * * We did expect you to call for this flooring in the early part of 1942 at which time we had plenty of flooring.

"We are willing to return the money you paid us any time that you desire us to do so. The reason that we suggest that we return you your money is because we have no idea when we will be able to furnish any flooring."

On or about November 24, 1947, after all wartime regulations prohibiting or limiting the sale or delivery of oak flooring had terminated and when oak flooring was available on the market, plaintiff again called for delivery, and defendant then wrote as follows:

"We are returning P. O. G-935 for oak flooring and with it we are attaching our check for * * * $360.00 which is the credit balance due your firm as per our books of this date.

"We are sorry to inform you that we are unable to fill this order and have no idea when we will be able to do so."

On December 9, 1947, in reply thereto, plaintiff wrote defendant stating:

"We are herewith returning to you your check * * * of $360.00, dated November 24, 1947, which you tendered to us as repayment of a so-called 'credit balance.' You may accept this as a refusal of your tender. As you know, this amount of $360.00 represents the purchase price of 4800 feet of # 1 common 1½″ oak flooring which we purchased from you November 14, 1941, and which you were to segregate and store for us."

This action was commenced on January 9, 1948. Defendant in its answer denied liability and alleged, for the first time, that before plaintiff had made demand for delivery a state of war in which the United States was involved was declared to exist; that the government of the United States had thereupon seized and appro-

priated all oak flooring of the type purchased, making it impossible for defendant to manufacture or procure the same for delivery to plaintiff; and that because thereof the contract in all things had been abandoned by plaintiff and defendant.

The trial court made findings in substance holding that the contract had been executed by the parties; that before a reasonable time for demand for delivery had elapsed wartime regulations had intervened, preventing delivery; that defendant had thereupon requested that plaintiff agree that such delivery be deferred for an indefinite period until the described lumber became freely available again, and that plaintiff had agreed thereto; that on November 21, 1947, when defendant finally refused to make delivery, all wartime regulations had ended and the lumber was available on the market; and that the parties had at all times recognized the agreement as subsisting and had never elected to terminate, repudiate, or abandon it. Based upon the market price of oak of the type described at the time of defendant's final refusal to deliver, the court found that plaintiff had sustained damages in the sum of $1,008 and ordered judgment therefor.

Defendant asserts that the questions to be determined here on appeal are:

(1) Was performance of the contract by defendant excused because of the war?

(2) Did title to the lumber pass to plaintiff as of the date of payment, as the trial court determined?

(3) Was demand for delivery of the lumber made by plaintiff within a reasonable time?

■ There is substantial evidence to sustain the trial court's finding that under the agreement defendant was to store the lumber purchased by plaintiff until plaintiff should demand delivery thereof; and that, before a reasonable time for such demand had elapsed, war regulations imposed by the federal government had made delivery illegal. Harry W. Mattison, vice president of plaintiff, testified with reference thereto as follows:

"* * * I asked him [defendant's representative] * * * would he be willing to sell us the entire amount *and deliver it to us from time to time, as we required it,* and he said he would; that he had it on hand, and would deliver it as we required it.

\* \* \* \* \*

"I said that we wanted to buy also 4,800 feet of oak, in the same manner, *to be delivered in the same way,* which Elmer said was O. K., and the price would be $75." (Italics supplied.)

Elmer T. Johnson, defendant's vice president, corroborated this. He testified as to a conversation with Mr. Mattison in the latter's office in November 1941 as follows:

"* * * he [Mr. Mattison] said, 'I would like to have you bill this to me now, then we will take some of it over to the factory before the first of the year, and some shortly after the first of the year, because we have no place to store it. Have you any objection to making delivery when we request it?' I said, 'No, that is all right, take it after the first of the year or whenever you call. We will take care of your order.' I also told him that we couldn't keep it for any length of time * * * because of the nature of the wood."

The record also disclosed that some maple flooring purchased by plaintiff under the same agreement was delivered without protest on December 16, 1942, long subsequent to the effective date of the described executive orders governing the oak flooring, establishing that at least up to that date defendant did not feel that an unreasonable delay had elapsed before demand for delivery had been made by plaintiff. Under such circumstances, it would seem clear there is more than sufficient testimony to sustain the trial court's findings on these issues.

■ A substantial portion of the argument on appeal is devoted to the question of whether title to the lumber passed to plaintiff as of the date of payment, so as to constitute an executed contract, or whether the agreement still remained executory as of the date of the federal orders made pursuant to the war powers of the na-

tional administration. In the light of the conduct of the parties to the agreement subsequent to the effective date of such orders, we do not deem it essential that this issue be determined here. Even if the transaction be regarded as an executory contract, the evidence is clear that at no time did defendant refund to plaintiff the money paid thereon, but at all times agreed that delivery would be made as soon as material became available.

There is little doubt that had defendant promptly refunded plaintiff its money after the contract became illegal defendant would have absolved itself from liability therefor. The rule is well established that illegality of performance of a contract such as this *terminates* all obligations of the parties thereunder if it is likely that changed conditions following termination of the period of illegality will substantially increase the burdens of performance. Restatement, Contracts, § 462. Where such illegality of performance is due to war or conditions created by war, both American and English courts have almost uniformly determined that the obligations of the parties to such an agreement are completely terminated rather than merely suspended until the end of the period of illegality.[2] Minnesota is in accord with this viewpoint.[3] Basic reasoning

---

[2]*American: E. g.*, Allanwilde Transport Corp. v. Vacuum Oil Co. 248 U. S. 377, 39 S. Ct. 147, 63 L. ed. 312; Village of Minneota v. Fairbanks, Morse & Co. 226 Minn. 1, 31 N. W. (2d) 920; 33 Minn. L. Rev. 181; 20th Century Lites, Inc. v. Goodman, 64 Cal. App. (2d) Supp. 938, 149 P. (2d) 88; Cinquegrano v. T. A. Clarke Motors, Inc. 69 R. I. 28, 30 A. (2d) 859; Blair, *Breach of Contract Due to War*, 20 Col. L. Rev. 413; Frey, *Contract Defaults and Cancellations in Wartime*, 38 Ill. L. Rev. 167; Pedrick and Springfield, *War Measures and Contract Liability*, 20 Tex. L. Rev. 710, 729-736. Pedrick and Springfield, at p. 732, candidly state:

"* * * The view was taken that the order was very apt to remain in force through the war and suspension would saddle the parties after the war with a much different deal. This approach commends itself not only with respect to construction contracts but single and even installment sale contracts as well, where the government interference is war caused and of unspecified duration. * * * Without accounting for all the decisions, the generalization may be ventured that government measures of unspecified

supporting this rule is that the probable length of a war is a speculative question; that conditions after its termination are likely to be vastly changed; and that to hold parties to a prewar contract to its terms in reality would be imposing upon them a contract which neither had contemplated or agreed upon. A number of courts have even held that frustration of performance of a contract because of intervention of war conditions automatically results in a termination of such contract, though the parties, or one of them, may have treated it as still in effect,[4] or even though there has been

---

duration taken under circumstances that suggest their indefinite continuation ought to dissolve rather than suspend contracts of construction, sale and affreightment, * * *. In addition to the commercially desirable certainty of such a rule it should expedite the complete conversion of industry for war production and clear the decks for post-war reconstruction unincumbered by lawsuits left over from a bygone era."

*English:* E. g., Metropolitan Water Board v. Dick, Kerr & Co. Ltd. [1918] A. C. 119; Hirji Mulji v. Cheong Yue Steamship Co. Ltd. [1926] A. C. 497; Morgan v. Manser [1948] 1 K. B. 184; McNair, Legal Effects of War (3 ed.) 152-166; McElroy, Impossibility of Performance (Williams ed.) 150-196.

The statement in the text is not intended to cover the cases involving long-term continuing contracts where the results vary considerably.

[3]Village of Minneota v. Fairbanks, Morse & Co. 226 Minn. 1, 31 N. W. (2d) 920; 33 Minn. L. Rev. 181.

[4]Morgan v. Manser [1948] 1 K. B. 184; Hirji Mulji v. Cheong Yue Steamship Co. Ltd. [1926] A. C. 497. This element was present in Village of Minneota v. Fairbanks, Morse & Co. 226 Minn. 1, 31 N. W. (2d) 920, but it was unnecessary to dispose of this factor in holding the contract terminated. The court in Morgan v. Manser stated (1 K. B. 191):

"* * * If there is an event or change of circumstances which is so fundamental as to be regarded by the law as striking at the root of the contract as a whole, and as going beyond what was contemplated by the parties and such that to hold the parties to the contract would be to bind them to terms which they would not have made had they contemplated that event or those circumstances, then the contract is frustrated by that event immediately and irrespective of the volition or the intention of the parties, or their knowledge as to that particular event, and this even although they have continued for a time to treat the contract as still subsisting. In those circumstances the court would grant relief and pronounce that the contract has been frustrated either by implying a term to that effect or otherwise.

partial performance thereof prior to the event making further performance impossible.[5]

■ While such authorities indicate that the contract was terminated rather than suspended in its operation, no principle set forth therein in any way inhibited the parties from contracting for future performance after termination of the conditions or orders which made present performance impossible.[6] Whether an agreement for such performance in the future came into existence here must, of course, be determined from the facts presented.

■ Here, the numerous conversations between plaintiff and defendant during the period of illegality and subsequent thereto, all of which terminated in defendant's promise that delivery was to be made as soon as market conditions permitted; defendant's retention of the purchase price until subsequent to the period of illegality; its failure at any time to advise plaintiff that the contract had been terminated or rescinded[7]; and its repeated assurances to plaintiff that delivery would ultimately be made, all indicate that the parties intended to perform after removal of the executive orders and that they in effect entered into an agreement for delayed performance. When defendant finally attempted to rescind the agreement, lumber of the type involved was available on the market. At

---

Their own belief and their own knowledge and their own intention is evidence, and evidence only, upon which the court can form its own view whether the changed circumstances were so fundamental as to strike at the root of the contract and not to have been contemplated by the parties."
See, also, McNair, Legal Effects of War (3 ed.) 144-145, 157.

[5]Metropolitan Water Board v. Dick, Kerr & Co. Ltd. [1918] A. C. 119; 20th Century Lites, Inc. v. Goodman, 64 Cal. App. (2d) Supp. 938, 149 P. (2d) 88; McElroy, Impossibility of Performance (Williams ed.) 193.

[6]Mr. Rogers, while suggesting this in his book, Effect of War on Contracts, pp. 70-71, also suggests in a footnote that the same result may be reached by the parties' subsequent conduct estopping them from asserting the frustration.

[7]Pedrick and Springfield, *War Measures and Contract Liability*, 20 Tex. L. Rev. 710, 734, note 95, suggest that the party who is prevented from performing should give notice of the termination, thus bringing certainty to commercial relations.

such a time, rescission could be effected only by mutual agreement, and, since plaintiff at no time consented thereto, it follows that the contract was effective and that defendant is liable in damages for its breach.

Affirmed.

