BARBAROSSA AND SONS, INC., Respondent,

v.

ITEN CHEVROLET, INC., Appellant.

No. 47156.

Supreme Court of Minnesota.

April 21, 1978.

Kelly & Finley, James F. Finley, and James E. Finley, St. Paul, for appellant.

Thomas, King, Swenson & Collatz and James J. Ryan, St. Paul, for respondent.

Heard before ROGOSHESKE, KELLY, and TODD, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

This is a buyer's action for breach of contract, seeking damages for the seller's failure to deliver a truck which was to be used in the buyer's sewer construction business. The trial court ordered judgment for the buyer, Barbarossa and Sons, Inc. (Barbarossa), in the sum of $4,950, including "cover" damages for the difference in the purchase price of the truck ordered from the seller and a replacement truck purchased from a different dealer and incidental and consequential damages. The seller, Iten Chevrolet, Inc. (Iten), appeals from a denial of its motion for amended findings and judgment or a new trial. Iten challenges the trial court's finding of breach of contract, claiming excuse of performance by failure of a presupposed condition under Minn.St. 336.2–615 and, assuming a breach, disputes the buyer's right to incidental and consequential damages. For the reasons which follow, we affirm the trial court's finding of breach of contract by Iten and the award of "cover" damages, but upon the evidence presented, we are compelled to order a remittitur of the award of incidental and consequential damages.

In November 1973, Barbarossa, a general contractor in the business of constructing water and sewer systems, sought to purchase a large truck for use in its business. The new truck was to replace an old, worn-out truck which had been used for carrying and laying large sewer pipes by means of a swing boom attached behind the cab. Barbarossa submitted its specifications for the truck to three dealers for their bids. In requesting the bids, Barbarossa stressed to each of the dealers that the truck was being ordered early because it was needed by April 1, 1974, for use in its 1974 construction season which lasts from mid-May to November.

On November 12, 1973, Iten submitted a bid which Barbarossa accepted by its purchase order dated November 16, 1973. As found by the trial court, these documents constitute the parties' contract. Neither Iten's bid nor Barbarossa's purchase order specified a delivery date; however, Iten's salesman orally estimated that the truck would be delivered by April 1, 1974, as demanded by Barbarossa. The contract did not contain an escape clause excusing Iten's performance in the event General Motors, Iten's source of supply, should fail to manufacture the truck as specified.

Shortly before April 1, 1974, Iten's salesman told Barbarossa that the truck would not be delivered until after July 4, 1974. Barbarossa's agent protested the projected delay but did not cancel the order, nor did Iten suggest cancellation. On June 12, 1974, General Motors warned its dealers of possible cancellations. Iten did not convey this information to Barbarossa. At the end of June or the beginning of July, General Motors canceled the order for Barbarossa's truck, although Iten did not inform Barbarossa of this until sometime in August 1974. At Barbarossa's request, Iten attempted to locate another comparable truck from dealers outside of Minnesota, but was unsuccessful.

On September 20, 1974, Barbarossa purchased a similar 1975 International truck from Crystal Motors, Inc., and in October 1974 instituted this suit seeking to recover the difference between the purchase price of the replacement truck and the truck ordered from Iten and damages for loss of the use of the new truck in its business during the 1974 construction season while its old truck was being repaired.

The 1975 replacement truck was purchased from Crystal Motors, Inc., for $29,910 less a trade-in allowance of $2,500 on Barbarossa's old truck. Iten's bid on a 1974 truck had been $28,900 less a trade-in allowance of $7,450 on the old truck. The difference in the net purchase prices was $1,010 and the difference in the trade-in allowances was $4,950. Iten proved, however, that if Barbarossa had received the 1974 truck which it ordered, that truck would have depreciated an estimated $4,000 in value between the requested delivery date of April 1, 1974, and the date of the "cover" purchase in September 1974. During the 1974 construction season, Barbarossa was able to fulfill all of its work contracts. Barbarossa proved, however, that it spent 48 hours of working time repairing its old truck, but it presented no evidence of repair expenses or overhead expenses incurred during the time the old truck could not be used. There was evidence that the cost of renting a replacement truck equivalent to the one ordered from Iten would have been $960 per month.

The trial court, sitting without a jury, found Iten in breach of contract and awarded Barbarossa $1,010 for "cover" damages, $1,440 for loss of 48 hours of working time at $30 per hour, and $2,500 for "reasonable loss from depreciation." Judgment was ordered for Barbarossa in the amount of $4,950 with interest.

On this appeal, Iten, claiming excuse of performance, disputes the trial court's finding that it breached the contract and, assuming a breach, challenges the awards of damages for lost working time and depreciation loss.

The first issue presented is whether General Motors' cancellation of the Barbarossa order excused Iten from performance by failure of a presupposed condition within the meaning of Minn.St. 336.2–615.[1] This court has not had occasion to interpret § 336.2–615 governing excuse of performance. As applied to the facts of this case, that section contains four requirements which must be met before a seller's performance may be excused: (1) a contingency has occurred which has made performance impracticable; (2) the nonoccurrence of that contingency was a basic assumption on which the contract was made; (3) the seller has not assumed a greater obligation; and (4) the seller has seasonably notified the buyer that there will be a delay or nondelivery.

Iten argues that General Motors' cancellation of the Barbarossa order and refusal to manufacture the truck, allegedly because of shortages created by subsuppliers of components of the vehicle, made performance impracticable. The record shows that General Motors did build several thousand trucks of this series during 1974 but that the Barbarossa order happened to be among the orders which were canceled. Iten made no special effort to avoid the cancellation of this particular order. Even after the cancellation by General Motors, Iten apparently believed there was a possibility of performance because it sought to procure a satisfactory truck from other dealers outside of Minnesota.

The Uniform Commercial Code provision governing excuse of performance has replaced the common-law requirement of impossibility of performance by a less stringent standard of commercial impracticability. See, 21A M.S.A. § 336.2–615, U.C.C. Comment 3; *Nora Springs Cooperative Co. v. Brandau,* 247 N.W.2d 744, 748 (Iowa 1976). We need not decide whether, upon

1. Minn.St. 336.2–615 provides in pertinent part:
"Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:

"(a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

\* \* \* \* \* \*

"(c) The seller must notify the buyer seasonably that there will be delay or nondelivery \* \* \*."

these facts, Iten's performance was made "impracticable" under the less stringent standard of the code, for we find that General Motors' cancellation of this order was not "a contingency the non-occurrence of which was a basic assumption on which the contract was made."

■ This second requirement of § 336.2–615, similar to the common-law impossibility defense, concerns the determination of whether the risk of the given contingency was so unusual or unforeseen and would have such severe consequences that to require performance would be to grant the promisee an advantage for which he could not be said to have bargained in making the contract. *Mishara Construction Co., Inc. v. Transit-Mixed Concrete Corp.,* 365 Mass. 122, 310 N.E.2d 363 (1974); Comment, 14 Duquesne L.Rev. 235. For cases defining and applying a similar common-law test of impossibility of performance, see, *Village of Minneota v. Fairbanks, Morse & Co.,* 226 Minn. 1, 31 N.W.2d 920 (1948);[2] *Canadian Industrial Alcohol Co. v. Dunbar Molasses Co.,* 258 N.Y. 194, 179 N.E. 383 (1932). In *Mishara Construction Co., Inc. v. Transit-Mixed Concrete Corp.,* 365 Mass. 122, 129, 310 N.E.2d 363, 367, the court found the test to be applied under § 336.2–615 is whether the contingency which developed was "one which the parties could reasonably be thought to have foreseen as a real possibility which could affect performance" and was thereby "one of that variety of risks which the parties were tacitly assigning to the promisor by their failure to provide for it explicitly." If it was, performance was required; if not, performance is excused. See, also, *Olson v. Spitzer,* S.D., 257 N.W.2d 459, 463 (1977); *Center Garment Co. Inc. v. United Refrigerator Co.,* 341 N.E.2d 669, 673 (Mass.1976); *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.,* 508 F.2d 283 (7 Cir. 1974).

■ Under the evidence submitted, the possibility that Iten would be unable to procure the truck from General Motors was clearly a contingency foreseen by the seller before entering the contract. Iten's salesman testified that it was Iten's usual practice to use a standard order form which included an escape clause making the obligation to deliver contingent upon the seller's ability to obtain the vehicle from the manufacturer. The standard order form was not used in this case, however, and no escape clause was included in Iten's offer to Barbarossa, nor was General Motors mentioned as the source of supply. According to the offer and acceptance which formed the contract, Iten undertook to perform without regard to whether General Motors would agree to manufacture the truck. Iten later searched for a replacement truck at other dealers, suggesting that it may have believed it possible to fill Barbarossa's order from a source other than General Motors. Within the bargain made by these parties, specifying no specific source of supply and providing no contractual excuse if General Motors failed to manufacture the truck, Iten's obligation to deliver was absolute.

A partial failure of a seller's source of supply generally has been treated as a foreseeable contingency, the risk of which is allocated to the seller absent a specific provision to the contrary in the contract. See, *Center Garment Co., Inc. v. United Refrigerator Co., supra* (failure of franchiser-seller's supplier to deliver acetate held not a contingency which would excuse nondelivery under U.C.C. § 2–615 where franchiser failed to provide against such contingency in the franchise agreement); *Canadian Industrial Alcohol Co. v. Dunbar Molasses Co., supra* (intermediary seller of molasses not excused from delivery under precode law by decline in refinery's production which was its sole source of supply; seller assumed the

**2.** In *Village of Minneota v. Fairbanks, Morse & Co.,* 226 Minn. 1, 12, 31 N.W.2d 920, 926 (1948), this court adopted the liberal test of impossibility of performance stated in 6 Williston, Contracts (Rev. ed.) § 1931: " ' * * * The important question is whether an unantici-

pated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract. If so, the risk should not fairly be thrown upon the promisor.' " (Italics omitted.)

risk of such contingency by failing to provide against it in the contract).[3] This court has not before considered a claim of excuse of performance on facts exactly comparable to these. In analogous situations, however, we have held the common-law excuse of impossibility of performance unavailable.[4] E. g., see, *St. Paul Dredging Co. v. State,* 259 Minn. 398, 107 N.W.2d 717 (1961) (failure to procure the necessary cooperation of a third party to fulfill the state's obligation to remove telephone poles did not excuse the state from performance, absent a specific contractual provision of excuse for that contingency).[5]

Iten's reliance on *Scialli v. Correale,* 97 N.J.L. 165, 117 A. 255 (1922); Restatement, Contracts, § 460; and other authorities which excuse performance for contingencies preventing the specifically identified subject of a contract from coming into existence does not support its position. In *Scialli,* a crop failure discharged a seller of grapes from delivery only because the seller had taken precaution to limit his obligation to deliver only if a crop were produced on a certain plot of ground on which the crop failure occurred. Absent such a specific identification of the subject matter of the

contract and a limitation of the seller's obligation, a farmer is not excused from delivery by a frost, flood, or other crop failure. E. g., see, *Bunge Corp. v. Miller,* 381 F.Supp. 176 (W.D.Tenn.1974); *Anderson v. May,* 50 Minn. 280, 52 N.W. 530 (1892). In its contract with Barbarossa, Iten neither specifically identified the truck it agreed to deliver as one to be manufactured by General Motors on a special order nor did it make its obligation to deliver the truck contingent upon General Motors' agreement to manufacture the truck, as it could have done.

In conformity with the stated authorities and upon the facts of this case, we conclude that General Motors' possible cancellation of this order was one of those varieties of foreseeable risks which the parties have tacitly allocated to the seller-promisor by its failure to provide against it in its contract. The cancellation was therefore not a contingency which can excuse the seller's performance under § 336.2–615. Iten could have conditioned its offer on its ability to obtain the truck from General Motors. It failed to do so and therefore must be held to its bargained obligation.[6] Having failed

3. See, also, *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.,* 508 F.2d 283 (7 Cir. 1974) (seller of potash not excused from delivery by closing of the mine which previously had been seller's principal source of supply, absent an escape clause explicitly so providing in contract); *Oliver-Electrical Mfg. Co. v. I. O. Teigen Const. Co.,* 177 F.Supp. 572 (D.Minn.1959) (absent an excuse or escape clause in the contract, manufacturer-seller held not excused from timely delivery of spacer fittings due to a failure of its supply of steel during a strike). But see, *Olson v. Spitzer,* S.D., 257 N.W.2d 459 (1977) (implement dealer excused from delivery of combine under U.C.C. § 2–615 by virtue of inability to obtain necessary corn head attachment from manufacturer because contract specifically provided: "This order is subject to [dealer's] ability to obtain such Equipment from the manufacturer").

4. Precode caselaw of excuse of performance continues in effect because it is not displaced by the code. Minn.St. 336.1–103; 2 Anderson, Uniform Commercial Code, § 2–615:12.

5. See, also, *Appliances, Inc. v. Queen Stove Works, Inc.,* 228 Minn. 55, 36 N.W.2d 121 (1949) (manufacturer of oil heaters not excused

from delivery by a steel strike reducing its supply of steel and rate of production); *City of Minneapolis v. Republic Creosoting Co.,* 161 Minn. 178, 201 N.W. 414 (1924) (manufacturer-seller of paving blocks not excused from delivery by a general railcar shortage; railcar shortage held a foreseeable contingency, risk of which was tacitly allocated to seller where it failed to provide an excuse for such contingency in the contract).

6. Our conclusion that General Motors' cancellation was not "a contingency the non-occurrence of which was a basic assumption on which the contract was made" makes it unnecessary to decide whether Iten's claim of excuse could satisfy the other requirements of § 336.2–615. We note without deciding, however, that Iten's failure to provide a contractual excuse against the foreseeable contingency of General Motors' cancellation may also be construed as having "assumed a greater obligation," preventing excuse under § 336.2–615 as interpreted in 21A M.S.A. § 336.2–615, U.C.C. Comment 8. We also note that Iten had access to information by which it could have learned of General Motors' cancellation of the order as early as June 12, 1974. In view of Iten's knowledge

to deliver the ordered truck, Iten was correctly found in breach of contract.

■ Iten concedes that if it did breach the contract Barbarossa is entitled to "cover" damages of $1,010, the increase in net purchase price incurred in purchasing a replacement truck. We hold that this part of the award is proper "cover" damages under § 336.2–712.

The second issue presented is whether Barbarossa is entitled to incidental and consequential damages of $1,440 for "lost working time" and $2,500 for "loss from depreciation," as awarded by the trial court. Iten challenges these items of damages on three grounds: (1) that they did not "result from the seller's breach" as required by § 336.2–715(2), because they allegedly were incurred before the final date of breach; (2) that as to the damages for "loss from depreciation," the expenses saved as a consequence of the seller's breach have not been deducted as required by § 336.2–712(2); and (3) that the damages awarded for both items are speculative and have not been proved in the amounts awarded by the trial court.

Section 336.2–715 permits the buyer to recover incidental or consequential damages "resulting from the seller's breach." [7] Both the loss of working hours claimed by Barbarossa and the depreciation or loss of trade-in value on Barbarossa's old truck occurred during the summer construction season of 1974. Iten argues that when Barbarossa was notified shortly before April 1, 1974, that Iten would be unable to deliver until after July 4, 1974, Barbarossa waived the right to claim a breach as of the orally

agreed April 1 delivery date by failing to cancel the contract. Iten further argues that when Iten informed Barbarossa in August that General Motors had cancelled its order, Barbarossa waived the right to claim a breach by consenting to Iten's search for a replacement truck until September 11, 1974, when Barbarossa gave notice of a "cover" purchase. By this reasoning, the expenses incurred during the summer construction season of 1974 did not "result from the seller's breach" which allegedly did not occur until September 1974. We do not agree.

■ Since neither the bid nor the acceptance forming the contract specified a delivery date, we imply a contract term requiring delivery within a reasonable time under § 336.2–309. At the time of entering into the contract in November 1973, Barbarossa demanded delivery by April 1, 1974, and Iten was made aware of Barbarossa's special need for the truck during its 1974 construction season. Iten's salesman orally agreed to the April 1, 1974, delivery date. Upon these facts, we hold that the contract calling for delivery within a reasonable time required delivery by April 1, 1974. When Iten failed to deliver on that date, it breached the contract.

■ The testimony shows that Barbarossa's agent orally protested the notice received before April 1, 1974, that delivery would be delayed until after July 4. Barbarossa clearly did not waive its right to incidental and consequential damages arising out of seller's delay in delivery by its mere inaction and failure to cancel the contract at this point.[8] Under the Uniform Com-

---

of Barbarossa's immediate need for the truck, it is unlikely that Iten "seasonably notified the buyer of * * * non-delivery," as required by § 336.2–615(c). See, *Bunge Corp. v. Miller,* 381 F.Supp. 176 (W.D.Tenn.1974).

**7.** Minn.St. 336.2–715 provides: "(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and

any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include

"(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

"(b) injury to person or property proximately resulting from any breach of warranty."

**8.** We note that even an affirmative oral acquiescence to a later delivery date would appear to have been insufficient to modify or extend the

mercial Code, Barbarossa had a right at that point to treat seller's delay in delivery as a partial breach and, without rescinding the contract, accept late delivery as a nonconforming tender, holding the seller responsible for any damages, including proper incidental and consequential damages caused as a result of the delay. See, §§ 336.2–601, 336.2–607, 336.2–714(1, 3), 336.2–715. Clearly, Barbarossa's failure to cancel the contract before September 1974 did not constitute a waiver of its right to any incidental and consequential damages which it could have recovered without canceling the contract.

■ Barbarossa's loss of the use of a truck in its business while its old truck was being repaired and the depreciation or trade-in value loss on the old truck were proper items of incidental and consequential damages under § 336.2–715, arising directly out of the partial breach of delayed delivery which occurred as of April 1, 1974. Iten was informed of Barbarossa's need to replace its old truck before the 1974 construction season and therefore had reason to know that its delay in delivering the truck could be expected to result in Barbarossa's incurring such additional expenses. Even if the truck had been manufactured and Barbarossa had accepted late delivery from Iten after incurring these expenses, Barbarossa would have been entitled to recover such expenses under §§ 336.2–714 and 336.2–715. At most, Barbarossa's inaction after receiving notice of late delivery may have been a waiver of its right to reject the truck when delivered. See, §§ 336.2–601, 336.2–602. We hold that the damages actually incurred for the loss of use of a truck and depreciation loss on the old truck are properly recoverable items of damages "resulting from seller's breach."

■ With regard to the amount recoverable for depreciation loss or decline in trade-in value of the old truck between April 1, 1974, and the date of the "cover" purchase, we find no evidence in the record

to support the $2,500 figure awarded by the trial court. The loss in trade-in value incurred by Barbarossa as a result of Iten's delay in delivery and ultimate cancellation is recoverable under §§ 336.2–712(2) and 336.2–715 as an item of damages incurred incident to effecting "cover." Barbarossa was offered $7,450 for its old truck in Iten's bid and received $2,500 for it on the cover purchase; the loss in trade-in value amounted to $4,950. Section 336.2–712(2) requires that "expenses saved as a consequence of the seller's breach" be deducted from the amount recovered. Iten proved that in the same time period Barbarossa would have incurred depreciation of $4,000 on the ordered truck, which it saved as a consequence of the seller's breach. Upon this record, Barbarossa has proved itself entitled to incidental damages of $4,950 less the $4,000 saved, or a total of $950 for depreciation or trade-in value loss. Accordingly, we order a remittitur of the $2,500 awarded by the trial court entitling Barbarossa to recover $950 for reasonable depreciation loss incident to effecting "cover."

■ We similarly find an absence of any evidence in the record to support the trial court's award of consequential damages totaling $1,440 for the 48 hours (at $30 per hour) that the old truck was not working. Barbarossa did prove loss of the use of a truck for 48 hours during the 1974 construction season while its old truck was being repaired, but there was no evidence produced which would support the $30 per hour figure awarded by the trial court. As previously stated, Iten had reason to know upon entering the contract that such a loss was likely to be incurred in Barbarossa's business as a result of Iten's failure to deliver by April 1, 1974. Barbarossa proved that the cost of renting an equivalent truck for use while its old truck was being repaired would have been $960 per month or approximately $32 per day. Fair rental value of a replacement vehicle has generally been recognized by courts which have

delivery term of the contract as we have found it to be. Since this contract as modified would be within the statute of frauds, § 336.2–201, it

could be modified only in writing under § 336.2–209.

considered the issue as a fair approximate measure of damages incurred by the loss of the use of a vehicle.[9] E. g., see, *Tremeroli v. Austin Trailer Equipment Co.,* 102 Cal. App.2d 464, 227 P.2d 923 (1951).[10] According to Barbarossa's evidence, measured by a fair rental value of a replacement at $32 per day, damages for the loss of use of a truck for 48 hours amount to $128.[11] A buyer who seeks damages for breach of contract has the burden of proving the extent of his damages. Upon the proof submitted, we can approve no more than $128 in consequential damages for loss of use of the truck. Accordingly, we order a further remittitur of the $1,440 awarded by the trial court entitling Barbarossa to recover $128 consequential damages.

For the reasons stated, the award of $1,010 "cover" damages to Barbarossa is affirmed and remittiturs of the other items of damage are ordered in accordance with this opinion. Judgment shall be entered for Barbarossa in the amount of $2,088 plus interest.

Affirmed in part and remittiturs ordered.

OTIS, J., took no part in the consideration or decision of this case.

---

9. We note that the loss properly compensated by this item of damages, under the proof submitted by Barbarossa, is not "lost working time" as stated by the trial court but "loss of the use of a truck."

10. See, also, *American T. & T. Corp. v. Thompson,* 193 Neb. 327, 227 N.W.2d 7 (1975); *Landeen v. Yonker, Inc.,* 84 S.D. 600, 175 N.W.2d 50 (1970); Annotation, 18 A.L.R.3d 493.

11. The testimony shows that Barbarossa's mechanics spent a total of 48 hours repairing the truck. Two 10-hour days were spent repairing the truck's frame, but the record is unclear as to how the remaining 28 hours were allocated between repairing the water pump and the radiator. Rather than remand this case for the taking of additional testimony on this point, and since fair rental value of a replacement truck is only an approximation of the measure of damages, we find that Barbarossa is entitled to the fair rental value of 4 days for the loss of the use of the truck.