## G. W. POWERS AND ANOTHER, *d.b.a.* THE POWERS PRODUCE COMPANY, v. DEL SIATS, *d.b.a.* SIATS REFRIGERATED SERVICE, AND ANOTHER.[1]

May 13, 1955.

No. 36,484.

[1]Reported in 70 N. W. (2d) 344.

516

*Bang, Nierengarten & Hoversten,* for appellants.
*Gleason, Ward, Orff & Johnson,* for respondents.

MATSON, JUSTICE.

Defendants appeal from an order denying their motion for a new trial.

Plaintiffs, consignors of a truckload of eggs, commenced this action against the defendant-carrier, Siats Refrigerated Service, and its agent-driver, Millard Gilmer, for damages resulting from the rejection by the consignee of the eggs because they were not delivered with an internal temperature of 50 degrees or less as required by the terms of the transportation contract. Since no question is raised as to the responsibility of defendant Siats Refrigerated Service for the acts of its agent, Gilmer, references herein to the defendant-carrier or the defendant include both Siats and Gilmer unless otherwise indicated.

Plaintiffs, husband and wife, are copartners doing business as the Powers Produce Company located in Wheaton, Minnesota. Their principal business is the purchase and sale of eggs. The eggs are bought from creameries and other independent buyers throughout the territory and taken to The Powers Produce Company where they are kept under refrigeration pending shipment to eventual buyers.

On July 20, 1952, plaintiffs directed defendant-carrier, Siats Refrigerated Service, to pick up a shipment of 500 cases of eggs for delivery to the Naval Supply Depot at Bayonne, New Jersey. Defendant Siats in turn employed defendant Gilmer, an independent hauler of produce by truck, to haul the eggs to their destination in New Jersey. Gilmer operated a tractor and a Dorsey trailer. For the purposes of refrigeration his trailer was equipped with an ice bunker which held approximately 1,800 pounds of ice when full. A blower fan was located on the inside of the trailer and on the top of the ice bunker to circulate the incoming air over the ice and thus keep the temperature in the trailer at the desired degree of refrigeration. A thermometer was located at the front of the trailer so that the inside temperature of the trailer could be observed at all times.

On July 24, 1952, defendant Gilmer arrived at Wheaton and loaded the 500 cases of eggs upon his truck. Two days before, the eggs had been tested for temperature and approved by a United States Army

inspector on behalf of the consignee. While the eggs were being loaded, Gilmer tested several cases for temperature and found a satisfactory temperature of approximately 45 degrees. After the eggs were loaded, defendant Gilmer signed a bill of lading on behalf of defendant Siats which contained these provisions:

"Refrigeration Is Necessary To Protect This Shipment.
"Eggs must deliver at destination with an internal temperature of 50° or less."

Gilmer then left Wheaton with the truckload of eggs for New Jersey. He did not, however, observe the temperature registered on his trailer thermometer before he left. After he had proceeded about 60 miles from Wheaton, or approximately one hour after his departure, he noticed that the temperature on the trailer thermometer registered 59 degrees. Gilmer, nevertheless, continued another 60 miles until he came to Willmar, Minnesota, where he again observed that the trailer thermometer still registered 59 degrees. In an effort to reduce the temperature in the trailer to cool the eggs, he there added ice to the bunker. A short distance beyond, at Litchfield, Minnesota, Gilmer again noticed that the temperature remained at 59 degrees; he then added salt to his ice bunker in an effort to make the ice melt faster. At 5:30 p. m. the same day, defendant Gilmer arrived at his home in Crystal Village just outside of Minneapolis. At that point, he had the trailer thermometer checked, and it was found to be in working order.

Early the next morning defendant Gilmer proceeded on his way to Bayonne, New Jersey. Periodically he stopped and added ice to the trailer bunker to keep the temperature of the eggs as cool as possible. The temperature, however, remained at 59 degrees. On July 29, upon arrival in Bayonne, the temperature had risen to 62 degrees. The consignee examined the eggs and rejected the entire shipment due to the excessive temperature upon delivery.

After the evidence of both parties had been presented, the trial court submitted the action to the jury in the form of a special verdict. The following questions were presented for their consideration:

"Do you find that the eggs were delivered to the carrier at a temperature of more than 50 degrees?"

"What was the difference between the value of the eggs as they would have arrived had they been delivered at destination with an internal temperature of 50 degrees, or less, and the value as they, in fact, did arrive?"

The jury answered "yes" to the first question and gave $1,125 in answer to the second.

The trial court adopted the jury's factual determinations and also specifically found that the defendants were not *negligent* in failing to deliver the eggs at a temperature of 50 degrees or less. The trial court concluded that plaintiffs were, nevertheless, entitled to judgment for $1,125 damages for defendants' breach of contract in failing to deliver the eggs at the stipulated temperature of 50 degrees or less. The defendants moved for amended findings or a new trial on the ground that plaintiffs' act or default in initially delivering the eggs to defendant-carriers at a temperature of *more than 50 degrees* constituted a fact wholly unanticipated by the parties and wholly inconsistent with the facts which they assumed to exist when they agreed to the terms of the bill of lading. Defendants' motion was denied, and we have this appeal from the part of the order denying a new trial.

■ Since the trial court's finding of an absence of negligence on the part of the defendant is unchallenged on this appeal, we are concerned only with defendants' liability as a carrier under the contract embodied in the bill of lading. It is conceded that defendants expressly contracted to deliver plaintiffs' eggs to the consignee at a temperature of less than 50 degrees and that the eggs were rejected because of defendants' failure to do so. Defendants assert, however, that they have no liability for such failure since nonperformance on their part must be excused on the ground that the eggs, when received by them from the plaintiffs, were of a temperature in excess of that permitted when they should ultimately be delivered to the consignee. Defendants contend that such excess initial temperature of more than 50 degrees constituted an unanticipated fact or cir-

cumstance which made performance of their promise vitally different from what the parties reasonably contemplated when they entered into the contract. This argument finds its basis in the relatively recent liberal application of the defense of impossibility to those situations in which events unforeseen at the time of contracting produce an excessive hardship upon one of the parties which was not reasonably contemplated or expected at the time of the execution of the contract.[2] Accordingly, the term "impossibility" is not limited to a scientific or actual impossibility of performance. Except where a contrary intent is manifest, and except where the impossibility or impracticability of performance is wholly attributable to the subjective inability of the promisor,[3] performance of a contractual duty may be excused when, due to the existence of a fact or circumstance of which the promisor at the time of the making of the contract neither knew nor had reason to know, performance becomes impossible, or becomes impracticable[4] in the sense that performance would cast upon the promisor an excessive or unreasonably burdensome

[2]See, 6 Williston, Contracts (Rev. ed.) § 1931; Restatement, Contracts, §§ 454 to 469; 4 Dunnell, Dig. (3 ed.) § 1789.

[3]Restatement, Contracts, §§ 455 and 456, provide:

"§ 455. SUBJECTIVE IMPOSSIBILITY DISTINGUISHED FROM OBJECTIVE IMPOSSIBILITY.

"Impossibility of performing a promise that is not due to the nature of the performance, but wholly to the inability of the individual promisor, neither prevents the formation of a contract nor discharges a duty created by a contract."

"§ 456. EXISTING IMPOSSIBILITY.

"Except as stated in § 455, or where a contrary intention is manifested, a promise imposes no duty if performance of the promise is impossible because of facts existing when the promise is made of which the promisor neither knows nor has reason to know."

[4]Restatement, Contracts, §§ 454 to 457; see, Standard Const. Co. Inc. v. National Tea Co. 240 Minn. 422, 62 N. W. (2d) 201; Village of Minneota v. Fairbanks, Morse & Co. 226 Minn. 1, 31 N. W. (2d) 920; Ewing v. Schlabach, 155 Minn. 152, 193 N. W. 36; Anderson v. May, 50 Minn. 280, 52 N. W. 530, 17 L. R. A. 555, 36 A. S. R. 642; Hokanson v. Western Empire Land Co. 132 Minn. 74, 77, 155 N. W. 1043, 1044, L. R. A. 1917C, 761, 762.

hardship, loss, expense, or injury. The distinction between objective and subjective impossibility·is not to be overlooked.

■ Realistically, when the court is confronted with a situation involving such impossibility of performance, the problem becomes one of allocating between the parties the burden of unreasonably excessive risks which the parties have encountered but which they did not, at the time the contract was made, foresee or provide for and by reason of which a greatly increased burden is placed upon the promisor at the time of performance.[5] This court, when such conditions have been found to exist, has relieved a party from the duty of performance.[6] A mere difficulty of performance does not ordinarily excuse the promisor, but where a great increase in expense or difficulty is caused by a circumstance not only unanticipated but inconsistent with the facts which the parties obviously assumed as likely to continue, the basic reason for excusing the promisor from liability may be present.[7]

■ Assuming, but without so deciding, that the ·act of the plaintiffs in delivering the eggs to the defendant-carrier at an excessive temperature was a circumstance which the parties did not anticipate, and that the obligation thereby imposed upon the defendants could not reasonably have been within the contemplation of the parties at the time of contracting, we cannot, under the circumstances here existing, hold that the defendants were thereby relieved from their duty of performance under the contract. Although defendant Gilmer was in apparent ignorance of the true temperature of the eggs when he received them (even though he had tested them in the course of loading), *he did discover the unusually high temperature registered by his tractor thermometer when he was only 60 miles from plaintiffs' place of business or about one hour after he had departed on his journey.* Thereafter, he added ice and salt to his bunker in order to

[5]See, Corbin, *Recent Developments in the Law of Contracts,* 50 Harv. L. Rev. 449 to 451, 464 to 466.

[6]Village of Minneota v. Fairbanks, Morse & Co. 226 Minn. 1, 31 N. W. (2d) 920; Standard Const. Co. Inc. v. National Tea Co. 240 Minn. 422, 62 N. W. (2d) 201.

[7]6 Williston, Contracts (Rev. ed.) § 1963.

reduce the temperature and cool the eggs. His efforts proved unavailing and the trailer temperature remained at 59 degrees. On the same day when he arrived at his home in Crystal Village, the temperature was still 59 degrees. He had the trailer thermometer checked and it was found to be reliable. He had every reason to believe, and by his own admission did believe, that the eggs had been delivered to him at an excessively high temperature. He did nothing, however, to inform either the plaintiffs or his employer, Siats Refrigerated Service, of the condition of the eggs. If he had consulted the shipper, or his own employer, it is not unreasonable to assume that he would have been ordered either to return the eggs for refrigeration or to store them in a refrigerated warehouse in Minneapolis for cooling. He asked for no instructions. On the contrary, he took it upon himself to deliver the eggs as they were in reliance upon his previous experience with egg shipments to the army which had been accepted at temperatures of over 50 degrees or accepted without any tests for temperature. In the light of Gilmer's action in electing to proceed with the overheated eggs in reliance upon his former experience, without notifying the plaintiffs or taking any steps to find out how the eggs could be cooled, it must be held that both defendants assumed a calculated risk that the consignee would not reject the eggs despite their excessive temperature.

A promisor who, after having assumed a contractual duty without then knowing or having reason to know of a fact which makes performance impossible or impracticable, subsequently acquires knowledge of such fact in time to avoid the dire consequences of nonperformance, but who despite such knowledge proceeds without taking reasonably prudent steps to avoid such consequences, cannot thereafter be heard to assert the defense of impossibility of performance. This equitable rule, which applies here, is sometimes referred to as an assumption of risk. 6 Corbin, Contracts, §§ 1328, 1329. An absolute assumption of risk may arise by contract or by conduct of the promisor which precludes a denial of that assumption.[8]

---

[8]See, Madeirense Do Brasil S/A v. Stulman-Emrick Lbr. Co. (2 Cir.) 147 F. (2d) 399; Salinger v. General Exch. Ins. Corp. 217 Iowa 560, 250 N. W. 13; Crown Embroidery Works v. Gordon, 190 App. Div. 472, 180 N. Y. S. 158; 6 Corbin, Contracts, § 1328.

■ Defendants' second argument is based upon another provision in the bill of lading reading as follows:

"No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, the authority of law, *or the act or default of the shipper or owner,* or for natural shrinkage." (Italics supplied.)

The foregoing provision is but a restatement of the causes which at common law absolve a carrier as an insurer of the safe transportation of goods. The common-law liability imposed upon a common carrier, and to which defendants herein are subject,[9] is thus stated in Di Vita v. Payne, 149 Minn. 405, 409, 184 N. W. 184, 185:

"The general rule is that a common carrier of goods is an insurer of the safe transportation of the goods committed to it for that purpose, and it is responsible for all damages to the same while in transit, unless such damage is occasioned by certain excepted causes. These causes are: The act of God, act of public enemy, the inherent quality or 'proper vice' of the articles themselves, or some act or omission of the shipper or owner."

Obviously, defendants have not brought themselves within any exception which absolves them from their common-law liability as insurers.

In order to relieve itself from liability as an insurer of the safe transportation of goods committed to it for that purpose, the carrier must show that the damage arose *solely* from one or more of the excepted causes, and it is of no avail to show that the shipper was negligent if the act of the carrier contributed to the loss or damage.[10]

[9]"A common or public carrier is one who, by virtue of his business or calling, undertakes, for compensation, to transport personal property from one place to another, either by land or water, and deliver the same, for all such as may choose to employ him; and every one, who undertakes to carry and deliver, for compensation, the goods of all persons indifferently, is, as to liability, to be deemed a common carrier." 1 Moore, Carriers (2 ed.) c. II, § 1.

[10]Di Vita v. Payne, 149 Minn. 405, 184 N. W. 184; Northwestern Marble & Tile Co. v. Williams, 128 Minn. 514, 517, 151 N. W. 419, 420, L. R. A. 1915D, 1077; see, Duncan v. G. N. Ry. Co. 17 N. D. 610, 118 N. W. 826, 19 L.R.A. (N.S.) 952; United States v. Savage Truck Line (4 Cir.) 209 F. (2d) 442.

524

In other words, the contributory negligence of the shipper does not absolve the carrier from its common-law liability. The general rule is that, when the shipper assumes the responsibility for the proper condition of the goods when loaded, or the responsibility for their proper loading, he becomes liable for the defects which are latent and concealed and which cannot be discerned by the ordinary observation of the carrier's agents; but if the improper condition of the goods or the manner of their loading is apparent, or otherwise becomes seasonably known to the carrier, the carrier will be liable for damages notwithstanding the negligence of the shipper.[11] In the instant case defendants' act of proceeding with the delivery of the eggs *after acquiring knowledge of their excessively high temperature* was at least a contributing cause of the rejection of the shipment by the consignee. It follows therefore that the defendants were not absolved from liability by any act of the plaintiffs.

The order of the trial court is affirmed.

Affirmed.

---

[11]Northwestern Marble & Tile Co. v. Williams, *supra;* Di Vita v. Payne, *supra;* United States v. Savage Truck Line, *supra;* Duncan v. G. N. Ry. Co. *supra.*