**WILLIAMS GRAIN COMPANY, Inc., a Corporation, Appellant,**

v.

**LEVAL & COMPANY, Inc. (now Louis Dreyfus Corporation), and Bunge Corporation, Appellees.**

**No. 16354.**

United States Court of Appeals
Eighth Circuit.

April 29, 1960.

Archer Wheatley, Jonesboro, Ark., for appellant.

Clark Kuppinger, Kansas City, Mo., for appellees.

Before VOGEL, VAN OOSTERHOUT and MATTHES, Circuit Judges.

VOGEL, Circuit Judge.

Leval & Co., Inc. (now Louis Dreyfus Corporation), and Bunge Corporation commenced separate suits against Williams Grain Co., Inc., to recover damages on account of the defendant's alleged breach of several contracts to sell and deliver soybeans to plaintiffs. Diversity of citizenship and the amount involved in each suit made for federal court jurisdiction. Defendant conceded the existence of the contracts and its non-compliance with them but sought to avoid its failure to perform on the grounds of impossibility and business frustration. The cases were consolidated for purposes of trial, tried to the court without a jury, and resulted in judgments against the defendant in behalf of each plaintiff. Thereupon the defendant appealed to this court.

The facts, which are not in dispute, indicate that plaintiff Bunge Corporation entered into three contracts with the defendant to purchase a total of 30,000 bushels, or approximately 20 freight carloads, of soybeans and plaintiff Leval & Co., Inc., executed two contracts for the purchase of 18,000 bushels, or approximately 12 carloads, each contract calling for delivery F.O.B. Piggott, Arkansas, during the months of October and November, 1950. While the contracts did not so provide, plaintiffs admitted, on request by defendant, that the parties contemplated that all of the soybeans would be shipped by rail to New Orleans for export. Defendant did ship two carloads of soybeans to Leval & Co., Inc., during October, 1950. No other soy-

beans, however, were shipped to either plaintiff. Ralph Williams, owner and manager of Williams Grain Co., Inc., testified that in November, 1950, he loaded five more carloads for application on the contracts but that he did not ship them because New Orleans during October and November, 1950, was under an embargo which prohibited the shipment of soybeans to that port without first obtaining permits from the American Association of Railroads, which defendant was unable to do. Williams applied unsuccessfully to the brokers who had negotiated the contracts for the permits but at no time did he request either plaintiff to furnish them nor did he give them an opportunity to specify shipment elsewhere. Defendant sought to excuse its failure to ship the other 25 carloads due the plaintiffs on the ground that railroad freight cars were unavailable during October and November, 1950. Defendant further claimed that because of the short soybean season, a lack of storage space in the area, and a considerable increase in the price of beans during that fall it was financially impossible for it to fill the contracts when cars did become available.

In finding that the car shortage did not excuse defendant's failure to ship the 25 carloads, the trial court explained:

"* * * there is always a shortage of grain cars in the Piggott area in the Fall of the year; and there is no satisfactory evidence from which a finding can be made that the 1950 car shortage was any worse than those in prior year (sic) and subsequent years."

As to the embargo, the court stated:

"* * * there is no evidence whatever that he notified either plaintiff that he had loaded any of those cars or was about to load them, or that he or any other representative of the defendant ever requested either plaintiff to furnish a permit or permits. Had the respective plaintiffs been notified of the loading

·of those cars, they would have given the defendant directions to send the cars to points other than New Orleans, as they would have been bound to do. Moreover, when contracts in suit are carefully examined, it will be seen that actually only one of them contained any express direction that the beans be shipped to New Orleans."

The trial court then assessed plaintiffs' damages on the basis of the difference between the contract price for the beans and the market value thereof as of the dates for delivery under the various contracts.

■ It is true that there is an exception to the universal rule that one who defaults in the performance of his obligations under a contract duly entered into must respond in damages for such breach. This exception is sometimes referred to as the business frustration or impossibility of performance doctrine. Generally, it means that, in the event of some happening which could not have been guarded against or the occurrence of something which would not ordinarily have been anticipated and therefore contractually excepted to and this without fault on the part of the party charged, the breach of performance is excused and no damages are recoverable by reason thereof. New York Trust Co. v. S. E. C., 2 Cir., 1942, 131 F.2d 274, 276, certiorari denied 318 U.S. 786, 63 S.Ct. 981, 87 L. Ed. 1153; Megan v. Updike Grain Corp., 8 Cir., 1938, 94 F.2d 551, 553; Glens Falls Indemnity Co. v. Perscallo, 1950, 96 Cal.App.2d 799, 216 P.2d 567; Berline v. Waldschmidt, 1945, 159 Kan. 585, 156 P.2d 865, 867; Powers v. Siats, 1955, 244 Minn. 515, 70 N.W.2d 344, 348–349; Restatement of Contracts, Sec. 288, p. 426–427. Professor Williston has explained in this regard that:

"The important question is whether an unanticipated circumstance has made performance of the promise virtually different from what should reasonably have been within the contemplation of both parties when they entered into the contract." 6 Williston on Contracts, sec. 1932, p. 5411.

That this is the law of Arkansas, which is binding upon the court in this case, is established by Butterworth v. Tellier, 1932, 185 Ark. 357, 47 S.W.2d 593, 594, wherein the Supreme Court of that state declared:

"* * * where the subject-matter of the contract has been destroyed or the event creating the impossibility is one which could not reasonably be supposed to have been within the contemplation of the contracting parties, the promissor is discharged from the performance of the contract or the obligation to answer in damages."

■ Applying that rule to the claim that the freight car shortage made delivery of 25 carloads impossible, the trial court found that there was always a shortage of grain cars in the Piggott area in the fall of the year and that the shortage in 1950 was no worse than that of prior years. Thus, had defendant wished to protect itself against loss and to be relieved of its responsibility under the contract through the happening of this foreseeable event, it could have and should have so provided in the agreement. Madeirense Do Brasil S/A v. Stulman-Emrick Lumber Co., 2 Cir., 1945, 147 F.2d 399, 403, certiorari denied 325 U.S. 861, 65 S.Ct. 1201, 89 L.Ed. 1982; City of Minneapolis v. Republic Creosoting Co., 1924, 161 Minn. 178, 201 N.W. 414, 419. The car shortage excuse is, therefore, unavailing. Consequently, it is unnecessary for us to consider any claimed justification for the defendant's failure to ship the beans when freight cars did become available.

■ Defendant's asserted defense that the embargo on soybean shipments to the port of New Orleans justified nonperformance is likewise unsound. The embargo or permit system had been in effect for years. Defendant knew or should have known of its existence and could, therefore, have contractually pro-

tected itself against any loss from it. Meyer Bros. Drug Co. v. Callison, 1922, 120 Wash. 378, 207 P. 683; cf., Oliver-Electric Mfg. Co. v. I. O. Teigen Const. Co., D.C.Minn.1959, 177 F.Supp. 572, 576. Additionally, as the trial court pointed out, a request by the defendant for domestic shipping orders would have resulted in directions from the plaintiffs to send the cars to points other than New Orleans. That being so, the embargo did not excuse the breach for, as has been pointed out in 6 Corbin on Contracts, sec. 1329, p. 273, impossibility

"* * * does not excuse a promissor from his contractual duty if he himself wilfully brought it about, or if he could have foreseen and avoided it by the exercise of reasonable diligence and efficiency. In such a case, the promised performance was not impossible in any sense, either at the time the contract was made or for some time thereafter."

See, also, Boehmer Coal Co. v. Burton Coal Co., 8 Cir., 1924, 2 F.2d 526; Meyer v. Sullivan, 1919, 40 Cal.App. 723, 181 P. 847.

The defendant relies upon Davis & Co. v. Bishop, 1919, 139 Ark. 273, 213 S.W. 744; Whipple v. Driver, 1919, 140 Ark. 393, 215 S.W. 669, and Holton v. Cook, 1930, 181 Ark. 806, 27 S.W.2d 1017, 69 A.L.R. 709, to support its contention that the facts of this case justified the defense of impossibility. However, in Davis a portion of the item to be sold never came into existence for reasons not within the contemplation of the parties. In Whipple, the court merely approved a general instruction on the defense of impossibility of performance and thereby indicated that unfavorable weather conditions might, under certain circumstances, excuse the breach of a contract to cultivate land. Finally, in Holton the court held that the defendant was freed from his contractual obligation to send his daughter to college when she became physically unable to attend. Those cases are manifestly distinguishable from the instant action. They in no way weaken our conclusion that where the difficulties of performance are foreseeable and, in the case of the embargo, avoidable, breach of the contract is not excused.

■ As a separate defense defendant contends that the court erred in permitting Louis Dreyfus Company to be substituted for plaintiff Leval & Co., Inc. At the time of the commencement of the so-called Leval action, the correct name of the plaintiff was "Leval & Co., Inc." On December 30, 1956, during the pendency of the suit, plaintiff corporation changed its name to Louis Dreyfus Corporation, the change being pursuant to section 40 of the General Corporation Law of the State of New York, McKinney's Consol.Laws, c. 23, in which state the plaintiff had been duly organized. The secretary of the corporation filed with the trial court on May 25, 1959, his affidavit disclosing that change. Claiming that the plaintiff Leval & Co., Inc., ceased to exist on December 30, 1956, defendant directs our attention to Rule 25(a) (1) of the Rules of Civil Procedure, 28 U.S.C.A., which provides:

"If a party dies and the claim is not thereby extinguished, the court within 2 years after the death may order substitution of the proper parties. If substitution is not so made, the action shall be dismissed as to the deceased party. The motion for substitution may be made by the successors or representatives of the deceased party * * *."

Defendant's contention is wholly without merit. Plaintiff Leval did not die or cease to exist within the purview of Rule 25(a) (1). All that occurred was that the corporation changed its name.

Affirmed.