BECK, *Appellant,*
*v.*
J. M. SMUCKER COMPANY, *Respondent.*
(No. 92183, SC 24438)
561 P2d 623

Paul D. Schultz, Oregon City, argued the cause for appellant. With him on the brief were Hibbard, Caldwell, Canning, Bowerman & Schultz, Oregon City.

James T. Dunn, Portland, argued the cause for respondent. With him on the brief were Eugene E. Faltz and Casey, Palmer, Feltz & Sherry, Portland.

Before Denecke, Chief Justice, and Tongue, Howell, and Bradshaw, Justices.

BRADSHAW, J., Pro Tempore.

**BRADSHAW, J.,** Pro Tempore.

This is a suit to foreclose a mechanic's lien based on labor and material furnished in an attempt to correct a condition of sand in the water of a well owned by defendant. Defendant counterclaims alleging that plaintiff did not perform according to the contract and seeks to recover a partial payment made in advance to the plaintiff. The trial court entered a decree dismissing plaintiff's complaint and awarding defendant judgment against the plaintiff upon defendant's counterclaim.

Plaintiff appeals, assigning as error first that the trial court's general finding was not supported by the evidence, and second that the trial court erred in receiving testimony, over objection, by two officials of the defendant's company that it was defendant's intent in accepting plaintiff's proposal not to pay the agreed contract price in the event plaintiff's proposal did not produce the desired result. This evidence was directed to defendant's contention that plaintiff's offer was in fact a guarantee of the results. Plaintiff denies this, contending that his offer was only a possible solution to the problem and not a guarantee.

The defendant operated a berry packing plant in the Woodburn area. A well located on the premises from which water was used in the packing process became practically unusable due to large quantities of sand in the water. In 1973 a Mr. Anderson of defendant company contacted the plaintiff in an attempt to eliminate the sand problem. The plaintiff has been in the well drilling business since 1946, and prior to that time he had been around well drilling operations all of his life. He had drilled over 4,000 wells and considered himself an expert in well drilling. He was familiar with the sand problems in wells in the Woodburn area and was one of the persons who knew all of the facts about wells in that area. The plaintiff had originally drilled the well for defendant in the early 1960s. At that time the plaintiff had prepared a well log which

indicated the depth of the well and the level of various earth strata or layers of dirt, gravel, rock and sand through which the well was drilled. The plaintiff had lost his copy of this log when his home had burned. During the first discussions with Anderson plaintiff requested that the defendant's copy of the log be furnished to him. Anderson was unable to find that copy in the office. At the time of originally drilling the well the plaintiff did not personally file the log with the state engineering office but did prepare a log and deliver it to an employe of the defendant, who promised to have it filed.[1] The plaintiff, when first contacted about the problem, without "too thorough a search," failed to find the log on file. Plaintiff's independent recollection was that the well was 140 feet deep.

The defendant's personnel who were involved in dealing with the plaintiff in regard to the sand problem had not been employed at that plant when the well was originally dug, nor did they have any knowledge of the depth or conditions of the well, nor did they have any experience or knowledge whatsoever regarding wells generally.

Plaintiff first attempted a pumping process of the well to eliminate the sand, which was unsuccessful. At a subsequent time Anderson again contacted the plaintiff and discussed the well problem. The plaintiff again asked Anderson for a copy of the log and again Anderson couldn't find it. The plaintiff asked for the log and stated:

"* * * I had asked that because the texture of the

---

[1] ORS 537.765 provides in part:

"(1) The business or activity of constructing new wells or altering existing wells is declared to be a business or activity affecting the public welfare, health and safety. In order to enable the state to protect the welfare, health and safety of its citizens, any water well contractor licensed under ORS 537.747, person or public agency constructing or altering a well, shall keep a log of each well constructed or altered after August 3, 1955, and shall furnish a certified copy of such log to the Water Resources Director within 30 days after the completion of the construction or alteration.

"* * * * *"

[ 610 ]

sand I couldn't tell exactly where it was coming from and I didn't remember."

Plaintiff thereafter offered a solution to the problem. Anderson requested a letter verifying the proposal and the price therefor. The plaintiff submitted such a letter, as follows:

"In regards to the sand problem with the twelve inch well I am offering the following as a solution and the cost.

"To drill a 6″ well along side the existing well to the gravel stratum. Then gravel pack with ⅜ to ¼ pea gravel by means of serging [sic]. After placing as much gravel as possibal [sic] by this method I will pump the well at its maximum capacity with a gas powered turbine pump capacity one thousand G.P.M. This I beleave [sic] will eliminate the sand problem.

"I will do this work for a total cost of four thousand dollars ($4,000.00).

"Trusting this meets with your approval."

The defendant accepted the proposal or offer, and plaintiff commenced work shortly thereafter. The first two days of work by the plaintiff were spent in removing the pump and cleaning out the well. During that process the plaintiff determined that the depth of the well was in fact 220 feet and not 140 feet as he had previously assumed. The plaintiff did not immediately make this discovery known to the defendant, but immediately thereafter proceeded to carry out the process described in his proposal of drilling the six-inch well to a depth of 112 feet to a sand and gravel layer.

At one time the plaintiff asked Mr. Icenogle, who was in charge of operations at the plant, for a copy of the well log. The plaintiff testified this was seven days after starting work. Icenogle testified it was three or four days. Icenogle immediately thereafter located the log in his office and delivered it to the plaintiff. The log indicated the well depth to be 220 feet and also that there were sand levels at three deeper locations, considerably below the 112 foot level.

Upon completion of the proposed work, the plaintiff determined that the sand condition in the well remained unchanged and that the process which he had proposed and carried out was entirely ineffective in correcting the problem because the sand was not getting in the water at that level. The plaintiff thereafter attempted some other pumping and moving of pipes in the well in an attempt to do everything possible while he was there to get clear water. He was unsuccessful, and finally plaintiff ceased all work on the well, having determined that the sand problem might be unsolvable, and in any event it would cost more to try to eliminate the sand condition than it would to start from scratch and drill an entire new well. The plaintiff had conversations with Anderson during this time, and explained to him the problems and his final conclusion. Anderson thereupon took the plaintiff to Mr. Icenogle and the plaintiff explained to Mr. Icenogle that to make further attempts to correct the sand condition might not be effective and at least would cost more than drilling a new well. At that point the defendant decided to use city water, and plaintiff discontinued any further work.

The plaintiff testified upon cross-examination as follows:

"Q   Without that log, would you have made a different proposal if you had known the well to be 220 feet instead of a hundred forty feet?

"A   Yes."

Laying aside the question of whether or not the offer made by plaintiff was a guarantee, the basic purpose of the contract between the parties was to at least try to solve the sand problem by the method proposed by the plaintiff. As the work progressed it finally became apparent that the basic purpose was entirely frustrated and impracticable by the use of any method due to the depth of the well and sand layers at great depths therein, making it more costly to remedy the situation rather than drill a new well.

The facts in this case are somewhat unique in that

absolute confirmation of the impossibility of correcting the sand condition by any method did not occur until the plaintiff had completed the work promised. However, the plaintiff did determine within the first two days on the job that the well was in fact 220 feet deep rather than 140 feet. The plaintiff further admits that even without the log he would not have made the offer had he known at that time that the well was 220 feet deep. A reasonable person with the experience and expertise of the plaintiff, upon learning of the true depth of the well, would have made further investigation and conferred with the defendant before blindly proceeding with the work which he would not have proposed had he known the true facts. Further investigation by the plaintiff would no doubt have revealed the impracticability or impossibility of accomplishing the basic purpose.

■ A promisor who, after having assumed a contractual duty without then knowing or having reason to know of facts which make performance utterly impractical or impossible, subsequently acquires knowledge of facts which would warn a reasonable person of impossibility in time to avoid useless performance but who, despite such knowledge, nevertheless proceeds with the useless performance, assumes the risk of impossibility and the promisee is relieved of the duty to pay for the useless performance. Annotation, 84 ALR2d 12, 62 (1962); *Powers v. Siats,* 244 Minn 515, 70 NW2d 344 (1955); 6 Corbin, Contracts § 1329.

■ Assuming that plaintiff's offer was not an absolute guarantee, nevertheless the plaintiff, upon discovery of the fact that the well was actually 220 feet deep, had the duty before proceeding with the work to take some action to further determine if the process he had proposed would still, under the conditions discovered, have some possibility of correcting the problem. Had he taken such action at that time, the impracticability or impossibility of correcting the problem would have become evident. His continued work thereafter was a futile gesture which he reasonably should have deter-

mined, and therefore the plaintiff assumed the risk of impossibility and is not entitled to recover payment for the work from the defendant. Further, the plaintiff is not entitled to retain the partial payment advanced by the defendant for such work, and the defendant is entitled to have that amount returned to him.

Since the basis of this decision is not affected by the question of whether or not plaintiff's offer was a guarantee, it becomes unnecessary to decide if the trial court erred in allowing defendant's witnesses to testify over objection in regard to their intention in accepting the offer.

The decree of the trial court dismissing the plaintiff's complaint and awarding defendant judgment on his counterclaim is affirmed.