NATIONAL FARMERS UNION
PROPERTY & CASUALTY
COMPANY, Appellant,

v.

FUEL RECOVERY COMPANY,
INC., Respondent.

No. C2-88-972.

Court of Appeals of Minnesota.

Dec. 13, 1988.

Review Denied Feb. 10, 1989.

Gene P. Bradt, Beth G. Sullivan, Hansen, Dordell, Bradt, Odlaug & Bradt, St. Paul, for appellant.

Richard W. Copeland, White Bear Lake, for respondent.

Heard, considered and decided by PARKER, P.J., and RANDALL and BOWEN,* JJ.

## OPINION

ROBERT E. BOWEN, Acting Judge.

Appellant National Farmers Union Property & Casualty Company (NFU) appeals from a judgment in this breach of contract action in favor of respondent Fuel Recovery Company (FRC) and from the trial court's order denying NFU's motion for amended findings, conclusions, and order for judgment. We affirm.

## FACTS

In December 1981, a leak was discovered in a gasoline storage tank at the Faribault Community Co-op Oil Association (Co-op). At that time, the Co-op was insured by appellant, NFU. NFU hired respondent FRC to clean up this first gas spill. FRC began clean-up operations in early 1982, and was paid for its services on invoices submitted on a time and material basis. In August 1982, NFU and FRC had discussions regarding an estimate on the total cost of fuel recovery operations through completion. On September 2, 1982, FRC submitted an estimate of $375,000 for the total cost of completion of the clean-up operations. FRC's estimate specifically excluded costs of possible additional requirements imposed by the MPCA. On November 8, 1982, Diane Shuble of NFU's claim department sent FRC a letter stating that she had "received verbal approval from Home Office of the cost estimate attached to your letter of September 2nd." The parties have consistently disagreed as to whether the September 2 estimate and NFU's November 8 letter constitute a fixed-sum contract to perform all work necessary for the clean-up (excepting costs of MPCA-mandated additional requirements) or merely NFU's approval of FRC's estimate of what the total costs of time and materials would be.

As of November 8, 1982, FRC had billed, and NFU had paid, approximately $135,000, and about 6,000 gallons of gasoline had been recovered. The recovered gas was stored in a tank owned and controlled by the Co-op. At some time before November 8, 1982, that tank developed a leak, and a second spill occurred approximately 400 feet from the site of the first spill, with the result that approximately half of the previously recovered gasoline leaked into the ground. Neither NFU nor FRC was aware of the leak or the second spill on November 8, 1982.

At the time of the second spill, the Co-op had a new insurer, Nationwide Insurance Company (NW). NFU and NW were unable to agree on which was responsible for paying for the costs of recovery of fuel from the second spill. FRC continued its clean-up operations until April 27, 1983, when, having incurred costs of approximately $100,000 more than NFU had paid, it was financially unable to continue the work. (NFU had refused to pay FRC anything over the $375,000 estimate, and NW had paid nothing.) FRC's shut-down resulted in loss of the "cone of depression" established by its operations to that date, which in turn caused the ground area involved in the first gas spill to become recontaminated with fuel.

On July 6, 1983, the Co-op, NFU, NW and FRC entered into a contract agreeing to submit to binding arbitration the following issues: the cost of fuel recovery resulting from the second spill; whether NFU was legally obligated to pay for the cost of grouting the recovery wells, in addition to the amounts already paid to FRC; the reasonable cost of the grouting; and the allocation of responsibility therefor between the two insurers. Because NFU and FRC continued to disagree as to the legal effect of FRC's $375,000 estimate and NFU's November 8, 1982 letter in response thereto, the issue of their rights and obligations under any contract between them was not submitted to the arbitration panel. Under the July 6, 1983 agreement, FRC resumed recovery operations, NW agreed to pay its start-up costs, and the two insurers each agreed to pay FRC $5,000 per month for eight months or until the recovery work was completed, whichever was earlier. The amounts paid by NW were to be credited to any award against NW in favor of FRC, and FRC was to refund any amount it received from NW in excess of the award. FRC agreed to refund to NFU all amounts received from NFU, regardless of the resolution of the arbitration, and NFU agreed that there should be deducted from the refund any amount determined to be owing FRC by NFU, in addition to the payments already made by NFU pursuant to the $375,000 estimate. Thus, NFU and FRC left open for further litigation the issue of whether or not they had a fixed sum contract for $375,000.

On May 7, 1985, the arbitration panel issued its findings and award. The panel found that: (1) the second gasoline spill occurred through no fault or act of FRC; (2) before the second spill, FRC had submitted bills for and had been paid $340,000, the amount being well within FRC's original estimate of $375,000; (3) FRC's clean-up could have been completed at a cost within the estimate, but for the second spill; (4) the gasoline spilled in each occurrence could not be separated or distinguished; and (5) as of January 1985, FRC

had incurred and billed to NFU costs of $109,566.98 in excess of the amounts paid by NFU. The panel awarded FRC one-half of the $109,566.98 against each of the insurers, and allocated any additional costs, to date of completion, 75% against NFU and 25% against NW.

On September 5, 1985, the panel issued an amended award reiterating its original award, but adding a provision that the rights and obligations under the arbitration agreement and any set-offs and credits thereunder were not affected or decided by the arbitrators. Subsequently, NW paid its share of the 1985 award; NFU did not. FRC ceased clean-up operations in October of 1985, and NFU commenced this action for breach of the alleged fixed sum contract. FRC counterclaimed for the $54,783.49 apportioned to NFU by the arbitrators.

The trial court found that: (1) the occurrence of the second gasoline spill was an unforeseeable, supervening event, the occurrence of which was neither contemplated nor assumed by the parties when FRC submitted its estimate and NFU accepted it; (2) the second spill resulted in a large increase in the expense and difficulty of performing the agreement to clean up the first spill as originally estimated on September 2, 1982; (3) the second spill was not caused by any act or fault on the part of FRC; (4) it was impossible to separate the two spills or distinguish between the gasoline spilled in the two occurrences; and (5) the MPCA imposed requirements upon the clean-up project after the second spill at the Co-op which were in addition to and different from those contemplated by the parties or reasonably foreseeable at the time of FRC's original estimate. The court also found that the arbitration award confirmed NFU's responsibility for payment of one-half of the $109,566.98 owing to FRC.

The trial court concluded that the second spill operated by law to relieve, excuse and discharge FRC from any alleged contract to complete clean-up of the Faribault Co-op property for a fixed sum of $375,000, and

that FRC was entitled to judgment on its counterclaim based on the arbitration award. The court ordered judgment in favor of FRC for $54,783.49 with interest.

## ISSUES

1. Did the trial court err in concluding that any fixed-sum contract between the parties was discharged by impossibility or impracticability?

2. If a fixed-sum contract existed between the parties, did respondent affirm it after performance was excused or discharged?

3. Did the trial court err in ordering judgment for respondent based on the arbitration award?

## ANALYSIS

Appellant does not attack the trial court's finding that the second spill was an unforeseeable, supervening event not contemplated by the parties. Rather, appellant argues that as a matter of law a fixed sum contract existed between NFU and FRC, and if a supervening event occurred sufficient to discharge the contract, FRC's conduct after the second spill constitutes affirmance of the contract as a matter of law. We agree that the issues presented by this appeal are purely legal ones and will discuss them accordingly.

### 1. Impossibility/impracticability.

The trial court's principal finding was that the second fuel spill was an unforeseeable, supervening event which neither of the parties contemplated in their agreement. The trial court further found that the two spills could not be separated, the second spill greatly increased the expense and difficulty of performance by FRC, and requirements imposed by the MPCA following the second spill presented a clean-up project much different from the one FRC and NFU had contemplated.

■ These findings give ample support for the trial court's conclusion that if a fixed price contract existed, it was discharged by impossibility. In *Powers v. Siats*, 244 Minn. 515, 70 N.W.2d 344 (1955), the supreme court discussed the doctrine of impossibility, stating:

[P]erformance of a contractual duty may be excused when, due to the existence of a fact or circumstances of which the promisor at the time of the making of the contract neither knew nor had reason to know, performance becomes impossible, or becomes impracticable in the sense that performance would cast upon the promisor an excessive or unreasonably burdensome hardship, loss, expense, or injury.

\* \* \* \* \* \*

A mere difficulty of performance does not ordinarily excuse the promisor, but where a great increase in expense or difficulty is caused by a circumstance not only unanticipated but inconsistent with the facts which the parties obviously assumed as likely to continue, the basic reason for excusing the promisor from liability may be present.

*Id.* at 520–21, 70 N.W.2d at 348–49 (footnotes omitted); *Village of Minnesota v. Fairbanks, Morse & Co.*, 226 Minn. 1, 31 N.W.2d 920 (1948); *see also First National Bank of Shakopee v. Edison Homes*, 415 N.W.2d 442 (Minn.Ct.App.1987). Thus it was not necessary for the trial court to make a finding on the issue of a fixed sum contract, any such alleged contract having been discharged by impossibility or impracticability.

### 2. Affirmance of discharged contract.

■ NFU does not controvert the factual evidence or findings relating to the discharge of the contract, but asserts that if the contract was discharged by a supervening event, FRC should have repudiated it instead of affirming it by continuing recovery efforts after the second spill. However, where FRC was required to comply with the MPCA's additional requirements, continued work under what it contended to be the terms of the arrangement, i.e. time

and materials accompanied by a $375,000 estimate, and thereafter resumed operations under the arbitration agreement, it cannot be said to have affirmed a fixed price contract as a matter of law as NFU now asserts. *Cf. Owosso Sugar Co. v. Drong,* 163 Minn. 216, 203 N.W. 610 (1925) (conduct consistent with party's own understanding of contract terms after obtaining knowledge of fraud, held not sufficient to constitute affirmance as a matter of law).

3. Quantum meruit under the arbitration award.

■ Finally, NFU argues that by enforcing the arbitration award and ordering judgment for FRC on its counterclaim, the trial court held that the award "voided a preexisting contract." In finding the occurrence of an unforeseeable, supervening event which operated to excuse FRC from performance under a fixed price contract, the trial court held that FRC was not bound by the alleged contract, and the share of the cost of the clean-up following the second spill allocated to NFU was not included in the $375,000 price. FRC was therefore entitled to recover, on a quantum meruit basis, the amount established by the arbitration award.

■ FRC requests damages, costs, disbursements and attorney fees for the "frivolous and groundless nature of NFU's appeal" under Minn.Stat. § 549.21 and Minn. R.Civ.App.P. 138. However, to award damages under Rule 138, it must be apparent that the appeal was taken merely for delay. *Sievert v. LaMarca,* 367 N.W.2d 580, 590 (Minn.Ct.App.1985). Although appellant did not prevail on any issue, its claim that if the alleged contract was discharged it was affirmed and then breached by FRC is not frivolous or without foundation. *See Drummond v. Hoelscher,* 383 N.W.2d 383, 385 (Minn.Ct.App.1986). Respondent is not entitled to attorney fees or double costs under Minn.Stat. § 549.21 or Rule 138.

## DECISION

The trial court correctly concluded that a supervening event discharged the alleged contract under the doctrine of impossibility. Respondent did not affirm the discharged contract. We affirm the trial court's award to respondent of $54,183.49 plus interest at the rate of 8% per annum from May 7, 1985.

Respondent, as prevailing party on appeal, is entitled to costs and disbursements under Minn.R.Civ.App.P. 139.01, 139.02, but is not entitled to attorney fees or double costs under Minn.Stat. § 549.21 or Rule 138.

AFFIRMED.

