# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-1918

_____

enXco Development Corporation

*Plaintiff - Appellant*

v.

Northern States Power Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: February 13, 2014
Filed: July 10, 2014

_____

Before SMITH, BEAM, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

enXco Development Corp. ("enXco") and Northern States Power Co. (NSP) contracted for the construction of a wind-energy project in North Dakota. enXco did not obtain a permit by a date certain, thus failing to satisfy a condition precedent to the contract. NSP then terminated the contract. enXco suffered several million dollars in losses.

enXco sued NSP for breach of contract. The district court[1] granted NSP's motion for summary judgment. On appeal, enXco contends that the district court erred in granting NSP's motion for summary judgment because the doctrines of temporary impracticability and disproportionate forfeiture prevent the district court from strictly enforcing the relevant condition precedent. We affirm.

I. *Background*

enXco develops renewable energy projects throughout the United States, especially solar and wind projects. NSP is an electric and gas company that provides energy to customers throughout Minnesota and the Dakotas.

enXco and NSP entered into two contracts in October 2008. The contracts involved a wind-energy-generation project in North Dakota known as the Merricourt Project ("Project"). The parties termed the first contract the Developed Wind Project Purchase and Sale Agreement (PSA). Under the PSA, enXco agreed to develop the Project site, which included obtaining the requisite permits. During this initial phase of the Project, enXco owned the Project's real estate and assets. Upon closing of the PSA, NSP would essentially purchase the Project's real estate and assets for $15 million.

The second, much larger contract was the Engineering, Procurement, and Construction Agreement (EPCA). Pursuant to the EPCA, NSP agreed to pay enXco over $350 million for engineering, procurement of infrastructure, construction, commissioning, start-up, and testing of the Project. The parties agree that one of the principal benefits of this two-contract structure was that neither party had an obligation to proceed with the EPCA until the parties closed the PSA, which would not occur unless the Project developed according to their expectations.

---

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

The PSA included various conditions precedent that each party had to satisfy prior to the "Long-Stop Date" set for March 31, 2011. According to enXco, the Long-Stop Date was not a point of contention during contract negotiations. In fact, enXco selected the actual date without argument from NSP. enXco contends that "[t]he purpose of a long-stop date is to serve as a milestone against which to measure whether a project is 'buildable' . . . and such dates are regularly extended." In fact, in two of the parties' previous wind-farm projects, the parties agreed to modify their contracts to postpone the applicable long-stop date.

The PSA also provided that "[t]he obligation of [NSP] to consummate the transactions contemplated by this [PSA] shall be subject to fulfillment at or prior to the Closing of each of the following conditions." One condition precedent required enXco to obtain a Certificate of Site Compatibility (CSC). The CSC is a permit that the North Dakota Public Service Commission (NDPSC) issues that must be obtained before the parties could begin construction on the Project. *See* N.D. Cent. Code § 49-22-02. The PSA also included a provision that stated "that in no event shall the Closing occur later than the Long-Stop Date." It also included the following termination clause:

> This Agreement may be terminated prior to the Closing: (i) by either [NSP], on the one side, or [enXco], on the other side, upon written notice to the other Party of such termination, in the event the Closing has not occurred or the conditions precedent to Closing in favor of the terminating Party have not been fulfilled or waived on or before the Long-Stop Date . . . .

It also provided that termination could occur without any liability accruing to the terminating party. Finally, the EPCA provided that the parties could terminate the EPCA should they fail to close the PSA.

enXco had approximately 29 months after the execution of the contracts until the Long-Stop Date to obtain the CSC. Under North Dakota law, a party must submit a letter to the NDPSC, stating that it intends to construct an energy conversion facility. *See* N.D. Admin. Code 69-06-03-01. After an applicant like NSP submits this letter, it must wait one year before submitting its CSC application. *See* N.D. Admin. Code 69-06-03-01 (2011) (amended in 2013 to omit the one-year wait period). enXco requested and received from the NDPSC a waiver of the one-year requirement in January 2009; thus, enXco could have submitted its application as early as January 2009.

A CSC application must demonstrate that the project would have a limited impact on endangered species. *See* N.D. Cent. Code § 49-22-09(10). Unfortunately for enXco, the United States Fish and Wildlife Service (USFWS) warned enXco that the Project could have a deleterious effect on two species of birds because of the proposed physical locations of the wind turbines. Chris Sternhagen, enXco's Project Development Manager, testified that this problem delayed its submission of the CSC application. He would later testify, however, that the turbine layout actually "played very little impact as to the schedule."

In any event, almost two years expired before enXco submitted the CSC application in October 2010. Thus, enXco had less than six months to obtain the CSC by the Long-Stop Date. North Dakota law, however, allowed the NDPSC to consider the completed CSC application for up to six months after its receipt. *See* N.D. Cent. Code § 49-22-08(5). Nonetheless, Sternhagen testified that a NDPSC staff member informed him that a decision would be reached in two-to-four months.

The NDPSC scheduled a statutorily mandated public hearing on the permit for December 21, 2010. Unfortunately, the hearing was postponed due to a snowstorm. The NDPSC conducted the hearing on February 10, 2011, but on March 17, 2011, the NDPSC discovered that the hearing occurred in the wrong county contrary to North

Dakota law. *See* N.D. Cent. Code § 49-22-13(1). As a result, a new hearing had to be scheduled, but North Dakota law also required a 20-day public notice. *See* N.D. Cent. Code § 49-22-13(4). Thus, the hearing was not rescheduled to occur until after the Long-Stop Date. enXco petitioned the NDPSC to waive the 20-day notice requirement. In support of this petition, Sternhagen informed the NDPSC that, unless the NDPSC waived the 20-day requirement, "NSP can terminate the [PSA] between the parties, effectively terminating this Project." At the resulting NDPSC meeting on the petition, enXco's counsel informed the NDPSC that "NSP would have the contractual ability to terminate April 1 and there's nothing that we can do as enXco to prevent that" if enXco did not obtain the CSC prior to the Long-Stop Date. The NDPSC denied the petition. On April 1, 2011, NSP terminated the PSA and thus the ECPA as well after the Long-Stop Date passed. enXco nonetheless obtained the CSC on June 8, 2011.

From execution of the contracts in October 2008 until their termination in April 2011, wind-energy-generation profit prospects declined such that NSP stood to lose significant amounts of money should it proceed with the Project. Apparently the market for wind turbines dried up significantly during this time. As a result, NSP had the economic incentive to avoid the contract—a fact that enXco emphasizes. Because the particular wind turbines that enXco purchased were already outdated, enXco could not resell them on the secondary market. Therefore, enXco redeployed them for use in a different project in Texas.

enXco purchased the turbines for $216 million. Experts testified that the turbines' post-termination value was between $83.3 million and $123 million, minus the $10 million cost enXco incurred to relocate them. Thus, the turbines diminished in value between $93 million and $141 million. enXco's valuation expert determined that the value of the Project's assets like real estate and permits totaled $0 because of the lack of market for the Project and the $15 million cost in maintaining the assets.

However, enXco representatives testified that enXco still hoped the Project site would eventually be profitable.

enXco sued NSP on May 4, 2011, in response to a declaratory-judgment action that NSP filed based on its termination of the contracts. The district court consolidated the cases, staying NSP's declaratory-judgment action pending the resolution of enXco's suit. enXco sued for declaratory relief and damages for breach of contract. The parties agreed, and the district court concluded, that Minnesota law applied to their contracts.

enXco argued that the doctrines of temporary impracticability and disproportionate forfeiture should apply to prevent strict enforcement of the condition precedent. The district court granted NSP's motion for summary judgment. The district court determined that NSP did not breach the contracts. The district court concluded that the conditions precedent and termination clause expressly permitted NSP to terminate the contracts if enXco failed to satisfy any condition precedent. Furthermore, the district court found that the parties were sophisticated and reached agreement after substantial arms-length negotiation. Thus, according to the district court, enXco should have appreciated the risk that it assumed in the event that it failed to obtain the required permit. The district court declined to apply the doctrine of temporary impracticability to a condition precedent. Additionally, it found that enXco could not demonstrate that it suffered a disproportionate forfeiture because it kept all of the real estate and assets associated with the project and bestowed nothing to NSP. Finally, the district court determined that it need not consider the materiality of conditions precedent as it would typical contract terms. enXco appeals, seeking reversal of the district court's grant of summary judgment to NSP.

II. *Discussion*

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

-6-

as a matter of law." Fed. R. Civ. P. 56(a). "We review the grant of summary judgment de novo, viewing the record most favorably to the nonmoving party and drawing all reasonable inferences in its favor." *Lackey v. Wells Fargo Bank, N.A.*, 747 F.3d 1033, 1036–37 (8th Cir. 2014) (quotation and citation omitted).

enXco concedes that it failed to obtain the CSC prior to the Long-Stop Date. Furthermore, enXco does not dispute that in so doing it failed to satisfy a condition precedent rather than an ordinary contract term. enXco agrees that if we strictly construe the condition precedent, then NSP had the contractual right to terminate the contracts. However, enXco contends that we should excuse its failure to obtain the CSC by the Long-Stop Date based upon the legal doctrines of temporary impracticability and disproportionate forfeiture.

## A. *Temporary Impracticability*

enXco contends that the doctrine of temporary impracticability should excuse its failure to satisfy the condition precedent that it obtain the CSC by the Long-Stop Date. More specifically, enXco argues that it was impracticable for it to obtain the CSC by the Long-Stop Date because of delays from a snowstorm, a hearing location error, and state law notice requirements. enXco contends that "inclement weather and regulatory error," which delayed the NDPSC's processing of enXco's CSC application for five months, made it "impracticable to obtain the CSC." As a result of this alleged impracticability, enXco was excused from fulfilling the condition precedent, rendering NSP's termination of the PSA and EPCA a breach of contract. Additionally, enXco argues that Minnesota law recognizes the doctrine of temporary impracticability as applied to conditions precedent in a contract. Finally, enXco argues that Minnesota law allows plaintiffs to use the doctrine of temporary impracticability as a sword or offensive legal mechanism to pursue breach-of-contract claims in addition to defendants' use of the doctrine as a shield or defense against such actions.

-7-

The doctrine of impracticability applies

> [w]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 261. The Restatement also recognizes that impracticability may sometimes be only temporary:

> Impracticability of performance or frustration of purpose that is only temporary suspends the obligor's duty to perform while the impracticability or frustration exists but does not discharge his duty or prevent it from arising unless his performance after the cessation of the impracticability or frustration would be materially more burdensome than had there been no impracticability or frustration.

Restatement (Second) of Contracts § 269. The Restatement further provides for application of the doctrine of temporary impracticability to situations where a promisor violates a condition precedent, stating, "Impracticability excuses the non-occurrence of a condition if the occurrence of the condition is not a material part of the agreed exchange and forfeiture would otherwise result." Restatement (Second) of Contracts § 271.

Assuming, without deciding, that Minnesota courts would apply the doctrine of temporary impracticability to conditions precedent for use as a sword, we conclude that the doctrine has no application on these facts. enXco argues that the several delays in holding a proper public hearing produced temporary impracticability. However, enXco waited approximately two years before applying for the CSC. enXco could have applied as early as January 2009, yet it waited until October 2010. enXco

-8-

submitted its application less than six months before the Long-Stop Date, and North Dakota law expressly authorizes the NDPSC to consider the application for up to six months. *See* N.D. Cent. Code § 49-22-08(5). The PSA's time table contemplated and assumed that the NDPSC process could be lengthy and not entirely predictable.

The various sources of delay were all foreseeable and manageable in the time frame agreed to in the contracts. Although problems surfaced related to endangered birds, enXco likely could have pursued some type of accommodation with the USFWS or NDPSC in order to ensure a timely submission of its application. Or, it could have insisted on a later Long-Stop Date, especially since the actual date was not a point of contention between the parties. enXco could have also negotiated for a more flexible Long-Stop Date (e.g., "The Long-Stop Date shall be no earlier than one year after enXco submits its application for a CSC."). *See Vill. Of Minn. v. Fairbanks, Morse & Co.*, 31 N.W.2d 920, 926 (Minn. 1948) ("A man may contract to do what is impossible, as well as what is difficult, and be liable for failure to perform."). In sum, enXco, by exercise of appropriate diligence within the terms of the agreement, could likely have avoided the circumstances that caused it to fail a condition precedent.

Furthermore, Minnesota courts have expressly acknowledged that "'[i]t is well settled that a promise which cannot be performed without the consent or cooperation of a third party is not excused because of the promisor's inability to obtain such cooperation.'" *D.H. Blattner & Sons, Inc. v. Firemen's Ins. Co. of Newark, N.J.*, 535 N.W.2d 671, 675 (Minn. Ct. App. 1995) (quoting *St. Paul Dredging Co. v. State*, 107

N.W.2d 717, 723–24 (Minn. 1961)).[2] Finally, in discussing the doctrines of impossibility and impracticability, Minnesota courts have stated that

> the problem becomes one of allocating between the parties the burden of unreasonably excessive risks which the parties have encountered but which they did not, at the time the contract was made, foresee or provide for and by reason of which a greatly increased burden is placed upon the promisor at the time of performance.

*Powers v. Siats*, 70 N.W.2d 344, 349 (Minn. 1955).

Here, the parties specifically contemplated what would occur in the event that the CSC was not obtained by the Long-Stop Date: NSP could terminate the contract. The PSA language regarding the satisfaction of conditions precedent and the termination clause expressly say so. The parties foresaw the risk of regulatory and weather delays and accounted for them. Although they could not foresee the specific circumstances that led to the non-occurrence of the condition, it is clear that the parties anticipated that the CSC might not be obtained in time. Furthermore, the doctrine of temporary impracticability does not apply when the government fails to

---

[2]Persuasive authorities confirm this sentiment. *See, e.g.*, 6 *Corbin on Contracts* § 1347 (Perillo rev. ed. 2010) ("[W]hen one contracts to render a performance for which a government license or permit is required, it is his duty to get the license or permit so that he can perform."). Other courts have explicitly recognized that the obtainment of a government permit is foreseeable, and thus the risk of failing to obtain it can be properly allocated to a certain party. *See Harvey v. Lake Buena Vista Resort, LLC*, 306 F. App'x 471, 473 (11th Cir. 2009) (per curiam) (slow processing of road permit due to several hurricanes was foreseeable); *1700 Rinehart, LLC v. Advance Am.*, 51 So. 3d 535, 538–39 (Fla. Dist. Ct. App. 2010); *Mortenson v. Scheer*, 957 P.2d 1302, 1306 (Wyo. 1998) ("The obligor is expected to provide in the contract for contingencies that are foreseeable. This is particularly true in an instance in which performance of the contract depends upon obtaining a governmental license or permit which is required." (citations omitted)).

issue a permit in a timely manner, especially where the parties recognized this possibility. *See D.H. Blattner*, 535 N.W.2d at 675. Consequently, the district court correctly declined to apply the doctrine of temporary impracticability.

## B. *Disproportionate Forfeiture*

enXco argues that it suffered a disproportionate forfeiture. enXco experienced an approximately $100 million diminution in value of its properties. On the other hand, NSP suffered no meaningful harm from enXco's tardy CSC. enXco further argues that Minnesota courts recognize that the doctrine of disproportionate forfeiture applies to the non-fulfillment of a condition precedent as well as for use as a sword rather than a shield. The district court determined that enXco did not suffer a disproportionate forfeiture because it retained title to all of the real estate and assets involved in the Project. enXco never transferred any of this property to NSP.

Assuming, without deciding, that Minnesota courts would apply the doctrine of disproportionate forfeiture to the non-occurrence of conditions precedent and for use as a breach-of-contract sword, we conclude that enXco has not suffered a disproportionate forfeiture. We reach this conclusion despite the alleged materiality of the condition precedent at issue. The Restatement notes that a "forfeiture" "refer[s] to the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance on the expectation of that exchange." Restatement (Second) of Contracts § 229 cmt. b. The Restatement further states:

> In determining whether the forfeiture is "disproportionate," a court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture.

*Id.* Weighing these competing interests as the Restatement suggests can be difficult.

-11-

Nevertheless, we have recognized that forfeitures may be appropriate where they are "consonant with notions of fairness and justice under the law." *Klipsch, Inc. v. WWR Tech., Inc.*, 127 F.3d 729, 737 (8th Cir. 1997) (quotation and citation omitted) (applying Indiana law). This court in *Klipsch* noted that forfeiture may be fair and just where able counsel represented sophisticated parties. *Id.* Also, forfeitures are legitimate when the parties included an express termination clause in the contract. *Id.* Additionally, no forfeiture occurs where the breaching party maintained ownership of the assets comprising the contract. *Id.* at 738. Minnesota courts are more likely to enforce express terms in a contract where counsel represented sophisticated parties in the drafting of the contract at issue. *See Metro. Sports Facilities Com'n v. Gen. Mills, Inc.*, 470 N.W.2d 118, 125 (Minn. 1991) (en banc) ("These sophisticated parties, presumably with the assistance of experienced and able counsel, exercised their liberty of contract and now are accountable for the product of their negotiations.")[3]

Here, enXco parted with nothing. It still maintained possession and ownership of the Project assets and real estate. enXco transferred the Project's physical capital for use in other projects, and it hopes to employ the real property associated with the Project in the future. NSP did not obtain ownership of any property as a result of termination. NSP therefore did not receive something for little or nothing. *Cf. Hideaway, Inc. v. Gambit Invs. Inc.*, 386 N.W.2d 822, 824 (Minn. Ct. App. 1986)

---

[3]*See also Harleysville Ins. Co. v. Physical Distribution Servs., Inc.*, 716 F.3d 451, 462 (8th Cir. 2013) (applying Minnesota law) ("Both [parties] were sophisticated parties—each was in the business of providing products and services in exchange for fees according to terms set by contract. In this context, common sense weighs most heavily in favor of giving the parties the benefits—and misfortunes—of the clear terms of their bargain."); 13 *Williston on Contracts* § 38:12 (4th ed. 2014) ("Although the court may regret the harshness of an express condition, as it may regret the harshness of a promise, it must nevertheless generally enforce the will of the parties unless to do so will violate public policy." (footnote omitted)).

(disproportionate-forfeiture doctrine applied where contract allowed non-breaching party to retain a business worth $13,000 after paying only $500). Notably, both enXco and NSP are sophisticated parties who have developed similar projects in the past. They were both represented by counsel during contract negotiations, which took place over the course of several months. In conclusion, we leave the parties to their bargain and do not apply the doctrine of disproportionate forfeiture.

### III. *Conclusion*

We affirm the judgment of the district court.

BEAM, Circuit Judge, concurring specially.

I concur in Parts I, II, IIA and III. The issues arising from the contracts at work in this dispute are continuing evidence of the country's unforseen and unfortunate economic turndown commencing in or about 2006 or 2007. There has been, as a result, a clearly disproportionate forfeiture suffered by enXco, possibly aided and abetted by NSP as it saw an obvious need to abandon this unneeded project. In my view, however, such a consequence is insufficient to allow enXco to overcome the force and effect of the "condition precedent" in dispute as contractually agreed upon by the parties.

_____